Argued and submitted November 8, 2004, decision of Court of Appeals and judgment of circuit court affirmed March 10, 2005

DANNY THOMAS RYAN,
*Petitioner on Review,*

*v.*

Joan PALMATEER,
Superintendent,
Oregon State Penitentiary,
*Respondent on Review.*

(No. 99C-18624; CA A118415; SC S51169)

108 P3d 1127

Stephen A. Houze, Portland, argued the cause and filed the brief for petitioner on review.

Kathleen Cegla, Assistant Attorney General, Salem, argued the cause and filed the brief for respondent on review. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

BALMER, J.

**BALMER, J.**

Petitioner in this post-conviction case alleges that he received inadequate assistance of counsel under Article I, section 11, of the Oregon Constitution and ineffective assistance of counsel under the Sixth Amendment to the federal constitution. He argues that his trial counsel's errors prejudiced him and that, even if he cannot prove actual prejudice, this court should grant post-conviction relief because of "structural error" at his trial.[1] The post-conviction court held that petitioner's rights had not been violated. The Court of Appeals affirmed without opinion. *Ryan v. Palmateer*, 190 Or App 398, 79 P3d 917 (2003). We affirm for the reasons stated below.

## I. FACTS AT TRIAL

We begin by describing the proceedings and evidence at petitioner's underlying trial. The state indicted petitioner for sodomy, attempted rape, third-degree theft, and three counts of menacing.[2] All the charges involved allegations by petitioner's former girlfriend that he had threatened her with a rifle and forced her to perform oral sex.

A. *Pretrial Motions*

Initially, petitioner was represented by appointed counsel who entered a not guilty plea and filed pretrial motions challenging the application of Ballot Measure 40 (1996)[3] and Ballot Measure 11 (1994)[4] to petitioner's case.

---

[1] In their briefs and pleadings, the parties in this case refer to claims of "structural error" and *"per se"* or "presumed" prejudice, and they often use the terms interchangeably. Although we acknowledge that those terms may have distinct meanings in other contexts, they do not appear to mean different things here. Therefore, we treat the parties' arguments and this opinion's analysis as applying equally to all those terms. For simplicity's sake, we refer to "structural error" only.

[2] After the initial indictment, petitioner was indicted separately for two counts of witness tampering because he allegedly asked a friend to write to the victim and ask her to refuse to testify or to change her testimony. All the charges were tried together. We do not discuss the witness tampering charges because none of petitioner's claims concern them.

[3] Ballot Measure 40 contained a number of provisions regarding criminal procedure and criminal trials. After the trial in this case, this court held Measure 40 unconstitutional. *Armatta v. Kitzhaber*, 327 Or 250, 285, 959 P2d 49 (1998). The legislature later enacted separately certain provisions of Measure 40. *State v.*

Petitioner dismissed his appointed counsel and retained trial counsel, who filed a motion *in limine* seeking, among other things, to suppress evidence of petitioner's previous convictions for DUII and solicitation, the victim's testimony that petitioner had told her that he had AIDS, the victim's testimony regarding telephone calls to her boyfriend and to her therapist, and the contents of a note that the victim discovered just before the crime.

The trial court addressed the pretrial motions immediately before the trial began. The prosecutor raised the matter of the motion *in limine* and informed the court that the state did not intend to introduce some of the evidence that the motion challenged, including petitioner's previous convictions for DUII and solicitation. Thereafter, the court rejected several of trial counsel's arguments in the motion *in limine* and ruled that the court would admit the victim's testimony that petitioner had told her that he had AIDS and her testimony regarding the contents of the note. (Trial counsel had challenged the latter testimony as not constituting the best evidence of the note.) However, pending offers of proof, the court withheld decisions regarding the admissibility of other evidence, such as the content of the victim's telephone calls to her boyfriend and to her therapist after the crime.

Trial counsel then directed the court's attention to the Measure 11 and Measure 40 motions that petitioner's previous counsel had filed, stating that he did not know whether the court had heard those motions. The trial court stated that it would adhere to the uniform rulings of the circuit court's motions panel concerning Measure 11 and advised trial counsel to reserve his rights on that issue. Trial counsel did so and also reserved his rights regarding Measure 40. The prosecutor then requested that the court not rely on any provisions of Measure 40 because petitioner's alleged crimes had occurred before the passage of Measure 40. The trial court agreed.

*Fugate*, 332 Or 195, 199-201, 26 P3d 802 (2001) (describing provisions of Oregon Laws 1997, chapter 313, commonly known as Senate Bill 936). However, those changes do not apply to this case.

[4] Ballot Measure 11 set mandatory minimum sentences for certain felony offenses. It was codified as ORS 137.700.

## B. *Voir Dire*

Jury selection began later that day. After asking the potential jurors what person they respected most, what that person would say about them, and what they would like "to see come out of this case," trial counsel began to "share [his] fears" with the jury pool. When he described a North Carolina defendant who had been "locked up pending trial" for three and a half years, the court ordered trial counsel to stop that discussion.[5]

Trial counsel then asked more specific questions about cases involving rape and sodomy.

"[Trial Counsel:] Okay. If somebody simply says—if somebody says—if somebody makes an accusation, 'I was raped or sodomized,' do we believe them automatically? We do? [Juror Ten], you're shaking your head yes.

"[Juror Ten:] I've had several friends that told me they have been raped and I believe them.

"[Trial Counsel:] And—

"[Juror Ten:] But I don't know anything. It all happened before I ever knew them.

"[Trial Counsel:] Why did you believe them?

"[Juror Ten:] Because they were my friends, and I (unintelligible). Something like that.

"[Trial Counsel:] Would anybody else in the room require something more than somebody just making an accusation? Do we need other evidence? For instance, in this case we're talking about Attempted Rape with a Weapon and Sodomy with a Weapon. Should we have a weapon? What if we didn't have a weapon?"

Trial counsel then talked with the jurors about the need for proof to support the charges. Trial counsel did not challenge the inclusion of Juror Ten on the jury.

After *voir dire*, the trial judge conferred with trial counsel, the prosecutor, and petitioner about trial counsel's implication that some defendants are incarcerated pending

---

[5] Presumably, trial counsel had intended to tell the prospective jurors that the North Carolina defendant had been innocent.

trial. The court informed petitioner of his right to keep the jury unaware of his incarceration and of the importance of that right. Petitioner personally responded that he wanted the jury to know that he was in custody, because he believed that he had been incarcerated unjustly. Trial counsel agreed, telling the court that he had disclosed that fact purposely. The court ordered trial counsel not to allude to petitioner's incarceration again.

## C. *The State's Case*

The state's case against petitioner consisted of the victim's testimony about the crime, the testimony of the victim's boyfriend and her therapist regarding telephone calls that the victim had made to them after the crime, and the testimony of petitioner's friends that petitioner had confessed to them that he had committed the crimes.

### 1. *The Victim's Testimony*

On direct examination, the victim testified that she ended her intimate live-in relationship with petitioner in June 1996 and started dating her current boyfriend, Klingforth, several months later. Klingforth was petitioner's best friend, and that fact made matters between petitioner and the victim increasingly acrimonious. At petitioner's invitation, the victim agreed to meet petitioner at his home on the evening of September 12, 1996, to finalize the breakup. Petitioner, a hairdresser, told the victim that he had an appointment with a client at his home at 8:00 p.m.

The victim testified that she arrived at 6:40 p.m. Soon after she arrived, petitioner asked her to have sex with him, but she refused. She testified that petitioner insisted that she go to his bedroom to get a gift that he had left there for her. On the bed, she found a "little ring-type box" containing a handwritten note reading, "Fuck you." The victim testified that petitioner then threatened her with a rifle, made her remove her clothing, and forced her to perform oral sex. He told her that he had AIDS and had slept with prostitutes and said, "I think I'm going to just go ahead and fuck you." However, instead of further assaulting the victim, petitioner showed her that the rifle was not loaded by "breaking it in half, opening it up, and [sliding] the barrel * * * down." The

victim described the weapon as an old rifle with a silver barrel. Petitioner said that he would call Klingforth to tell him that they had "made love for the last time and parted as friends." The victim left the house and went to her car, but petitioner followed her and took two letters from her car that she had written to him. Then petitioner's client arrived, and the victim drove away.

The victim then described a series of telephone calls that she had placed and received after leaving petitioner's home. From the car, she called Klingforth, telling him that petitioner would be calling but that she had not consented to anything that petitioner might describe. Klingforth asked the victim whether petitioner had raped her, and she said that he had not. Upon arriving home, she called Klingforth again to say that she would call again shortly, after her son-in-law, who lived with her, had left the house. Later, she called Klingforth a third time and told him that petitioner had used a gun and had forced her to have oral sex. She then received a call from petitioner, who told her that he had placed a call to Klingforth as he had promised. Later that night, she called her therapist and left a message saying that petitioner had used a gun and had forced her to have oral sex. The following day, the victim told her employer about the incident, and he convinced her to call the police. Later, petitioner came to the victim's workplace, and her employer asked him to leave.

### 2. Testimony Corroborating the Victim

The victim's therapist testified that the victim had left a message on her office answering machine on the evening of September 12. She testified that the victim had been "obviously very upset." The therapist had erased the message, but her notes read that "Boyfriend [petitioner] forced oral sex and threatened to kill her. [Victim] very shaken, not certain what to do."[6]

---

[6] Over trial counsel's objection, the trial court admitted the therapist's notes regarding the message under the business records exception to the hearsay rule. (In this and other instances in which we describe the trial court's rulings in petitioner's criminal case, the correctness of the rulings is not at issue, and we express no opinion regarding them.)

Klingforth's testimony corroborated the victim's story about the times of the telephone calls. He described her demeanor in the first telephone call as "terribly shaken up * * * on the verge of crying." In the second and third calls, she had been "a little more relaxed" but still shaky and upset. Klingforth did not testify to the specifics of the conversations with the victim in his direct examination. He did, however, say that the conversation concerned the victim's meeting with petitioner and that he had asked the victim whether petitioner had raped her. Klingforth also described petitioner's telephone call to him, and his story mirrored the victim's account. On cross-examination, trial counsel asked Klingforth whether the victim had told him that petitioner "had held a gun to her head and forced her to perform oral sex on him." Klingforth said yes.

The victim's employer testified that the victim had been crying at work on the day after the incident. He asked her about it, and, when she told him about the crime, he convinced her to call the police. Later, he heard the victim yelling and saw that petitioner had entered the office. He asked petitioner to leave, and petitioner complied. The victim's employer described the victim's reaction as "horrified" and "shaking beyond belief."

### 3. Testimony Regarding Petitioner's Confessions

Two of petitioner's friends, Siemens and Dobbins, testified that petitioner had confessed to forcing the victim to have sex at gunpoint. On direct examination, Siemens testified that, in October or November 1996, while traveling to a mutual friend's barbecue, petitioner had told him that he had held a gun to the victim's head and had had sex with her. On cross-examination, Siemens testified that he and petitioner had been drinking beer during that conversation, but that they had not been drunk because they had just started their first drinks.

Dobbins testified that in the autumn of 1996, while driving to work together, petitioner had told him that he had "held a gun on [a] woman and sodomized her," but that the gun had not been loaded. Dobbins testified that a detective

later interviewed him about petitioner, but that he had forgotten to mention petitioner's confession. He called the detective and described the confession in a second interview. On cross-examination, Dobbins said that he had forgotten about the conversation because he had been upset about his recent separation from his wife.

### D. *Motion for Acquittal*

After the state rested, trial counsel moved for acquittal on all charges. The trial court reviewed the elements of each charge and granted the motion as to the theft charge because the state had not presented evidence showing that the victim's letters to petitioner were items of value. The court denied the motion as to the other charges.

### E. *Petitioner's Case*

Petitioner sought to prove that the state's case was implausible because the state's witnesses were untrustworthy and because petitioner had not owned a gun matching the victim's description on the day of the incident.

#### 1. *Berardinelli*

Petitioner called Berardinelli, who knew both petitioner and Klingforth. Apparently, trial counsel had intended to cast doubt on Klingforth's credibility by having Berardinelli describe the breakup between petitioner and the victim, and the bad blood it had created between petitioner and Klingforth. However, trial counsel was unable to elicit any substantive testimony from Berardinelli because the trial court ruled that counsel's questions, in the form that counsel put them, would have elicited only irrelevant evidence.[7]

#### 2. *Larson*

Petitioner then called Larson, the client who had come to petitioner's house on the day of the incident. Larson

---

[7] Again, we recite the trial court's ruling only as part of our review of the events at petitioner's criminal trial. The correctness of that ruling is not at issue here, and we express no opinion regarding it.

testified that, when she had arrived, the victim had been sitting in the victim's car in petitioner's driveway, and petitioner had been talking to her. She said that neither the victim nor petitioner had appeared upset and that the victim had driven away normally. On the state's cross-examination, however, Larson testified that she had not seen the victim's face; she simply recognized the victim's car and saw that someone, whom she assumed to be the victim, was in it.

### 3. *Taylor*

Petitioner next called Taylor, his private investigator. Trial counsel began questioning Taylor regarding his interview with Dobbins, and the state objected on hearsay grounds. The trial court excused the jury and directed trial counsel to submit an offer of proof. Rather than questioning the witness, trial counsel attempted to describe what Taylor's testimony would be; the trial court admonished him repeatedly that, because the jury had left the courtroom, trial counsel should make his offer of proof by questioning the witness directly.

Trial counsel complied. In response to counsel's questions, Taylor testified that Dobbins, who was then petitioner's roommate, had told him that petitioner kept no guns in the house. Taylor also testified that he had interviewed the victim and that he found her "very cold, very calculating * * * [like] one of those Sharon Stone movies." The trial court excluded the testimony regarding Dobbins as hearsay and the testimony regarding the victim as overly prejudicial.[8]

### 4. *Petitioner's Mother*

Petitioner's mother testified that petitioner had owned two guns, both with "blue-black" barrels. She testified that neither gun broke in half for loading.

### 5. *Petitioner's Testimony*

Finally, petitioner testified that he had owned two guns, neither of which broke in half for loading. He said that he had sold both guns to a friend, Pedersen, in December

---

[8] We note again that the trial court's rulings are not at issue here, and we express no opinion as to whether or not they were correct.

1995, but that he had lost the sales receipt. Petitioner testified that Pedersen had moved to Idaho and that neither he nor his investigator had been able to find him.

Petitioner claimed that he had not harmed the victim on the night of the incident, but that he had called her a "whore or prostitute" during their discussion and that she had slapped him. Petitioner testified that, after the victim left, he had called Klingforth to say that he and the victim had "made love" but had "broke[n] off as friends." Petitioner testified that he also had called the victim to apologize for insulting her. After learning of the victim's charges against him, petitioner had visited her workplace and asked her to drop the charges. Petitioner denied telling Siemens or Dobbins that he had assaulted the victim. However, he testified that he and Siemens had been drinking heavily during the time of his alleged confession.

On cross-examination, the prosecutor then confronted petitioner with the evidence that petitioner had told the police that he had sold the guns, not to Pedersen, but to "an unknown person." The prosecutor also suggested that petitioner may have destroyed the receipt identifying the date and the buyer of the gun.

After the defense rested, the state brought one rebuttal witness, a police officer who testified that petitioner had told him that he had sold the two guns to "an unknown person."

F. *Closing Statements and Verdict*

The state's closing argument emphasized the victim's credibility as demonstrated by the corroborating testimony of her therapist, her employer, and Klingforth. The state noted that Siemens' and Dobbins' testimony that petitioner had confessed provided further corroboration. The state characterized petitioner's testimony as untrustworthy, because he had given two different stories about the identity of the gun buyer.

Trial counsel emphasized the victim's motive to punish petitioner for his infidelity, the prior sale of the guns allegedly used in the crime, and the untrustworthiness of

Siemens and Dobbins. He noted that Siemens had been drinking during petitioner's alleged confession.

The jury convicted petitioner on all seven counts. A jury poll revealed that its verdict was eleven to one on all counts except for attempted rape, on which its verdict was ten to two. Each count required the vote of ten jurors for a conviction. Juror Ten was in the majority on each count. Petitioner did not appeal, but later chose to seek post-conviction relief.

## II. POST-CONVICTION PROCEEDINGS

In his post-conviction petition, petitioner claimed that trial counsel's representation of him violated Article I, section 11, of the Oregon Constitution and the Sixth and Fourteenth Amendments to the United States Constitution. He alleged that trial counsel had committed numerous errors, including the failure to challenge Juror Ten. Among other evidence, petitioner submitted an affidavit from the trial judge stating that "trial counsel did the poorest job of any trial lawyer [that he had] observed" in his entire career. The trial judge testified that trial counsel's performance had been prejudicial to petitioner's case. Petitioner claimed that, although there was sufficient evidence to show that trial counsel's inadequacy had prejudiced him, the post-conviction court need not find prejudice because trial counsel's performance had "constructively denied [him the] right to counsel" under both constitutions.

The post-conviction court rejected petitioner's arguments and dismissed the petition. Petitioner sought reconsideration, but the court adhered to its initial decision. In both its initial opinion and its denial of reconsideration, the court made various findings of fact. The court found that trial counsel was inexperienced and "did a very poor job" of representing petitioner. The court also found that the trial judge, despite his testimony that trial counsel had performed poorly, had done nothing to stop the trial or to advise petitioner that trial counsel was violating his right to representation. In fact, the judge had commented several times towards the end of the trial that he did not want to make any mistakes that might cause a reversal "after all this work."

Finally, the court noted that the state's case had been very strong, in part because the victim had been a credible witness and because two of the state's witnesses were petitioner's friends. The court concluded that the result would have been the same, even if trial counsel had made no mistakes.

Based on those findings, the post-conviction court concluded that, although trial counsel's performance was "far below the acceptable standard of reasonable skill and judgment required of all attorneys," petitioner had failed to establish by a preponderance of the evidence that trial counsel's performance had caused him actual prejudice. On reconsideration, the post-conviction court further held that the " 'sum' of trial counsel's errors do[es] not constitute 'structural error' as that term is defined by federal case law." As noted, the Court of Appeals affirmed the post-conviction court's judgment without opinion, and we allowed review.

## III. OREGON CONSTITUTIONAL CLAIMS

On review, petitioner argues that this court should set aside his conviction and grant a new trial because trial counsel made errors that prejudiced his case. He further argues that trial counsel's errors, taken together, were so egregious that he should be granted a new trial without showing actual prejudice, because the entire underlying trial was infected with "structural error." We first address petitioner's theories under the Oregon Constitution and then review his theories under the federal constitution. *See Sterling v. Cupp*, 290 Or 611, 614, 625 P2d 123 (1981) (explaining order of consideration).

A. *Inadequate Assistance of Counsel*

■　　Article I, section 11, of the Oregon Constitution provides, in part, that "[i]n all criminal prosecutions, the accused shall have the right * * * to be heard by himself and counsel." To prevail on his post-conviction claim of inadequate assistance of counsel under Oregon law, petitioner must demonstrate, by a preponderance of the evidence, the two elements of that claim: that trial counsel "failed to exercise reasonable professional skill and judgment, and that petitioner suffered prejudice as a result." *Lichau v. Baldwin*, 333 Or 350, 359, 39 P3d 851 (2002).

■ A showing that the lawyer's acts or omissions preju-
diced a petitioner's case is an essential element of establish-
ing a claim of inadequate assistance of counsel. *Stevens v.
State of Oregon*, 322 Or 101, 110, 902 P2d 1137 (1995)
(" ' "[O]nly those acts or omissions by counsel which have a
*tendency to affect the result* of the prosecution can be
regarded as of constitutional magnitude." ' " (quoting *Trujillo
v. Maass*, 312 Or 431, 435, 822 P2d 703 (1991), quoting
*Krummacher v. Gierloff*, 290 Or 867, 875, 627 P2d 458 (1981);
emphasis in *Stevens*)); *Trujillo*, 312 Or at 437 ("[P]etitioner
[must] establish * * * facts demonstrating that he was
prejudiced as a result of counsel's acts or omissions.");
*Krummacher* at 875 ("Adequacy of assistance of counsel
allows for errors which are inconsequential in the context of
the entire trial or proceeding.").

■■ Petitioner claims that trial counsel's decision not to
challenge Juror Ten was a lapse of "reasonable professional
skill and judgment" that prejudiced him. As described above,
Juror Ten asserted during *voir dire* that "I've had several
friends that told me they have been raped and I believe
them." Petitioner contends that that statement proves that
Juror Ten was biased against him because she was predis-
posed to believe accusations of rape. The court should exclude
a prospective juror for "actual bias" if the "prospective juror's
ideas or opinions would impair substantially his or her per-
formance of the duties of a juror to decide the case fairly and
impartially on the evidence presented in court." *State v.
Barone*, 328 Or 68, 74, 969 P2d 1013 (1998). Petitioner claims
that trial counsel should have challenged Juror Ten and that
his failure to do so was prejudicial because Juror Ten could
have been the deciding vote on the charge of attempted rape.

We disagree. For petitioner to prevail, he must be
able to demonstrate either (1) that Juror Ten actually was
biased and therefore that trial counsel erred by failing to
challenge her for cause or (2) that trial counsel failed to exer-
cise reasonable skill and diligence when he concluded that
Juror Ten would be able to evaluate the evidence impartially
and, for that reason, failed to use one of his peremptory chal-
lenges to remove her from the jury. As we describe below,
petitioner did not make either showing here.

As trial counsel's colloquy with the other jurors reveals, at least one other juror noted the difference between believing a friend's accusation of rape and evaluating evidence as a juror in a criminal trial.

> "[Trial Counsel:] * * * I'd like to know if you would want more than just somebody's accusation of rape or sodomy. What other kinds of things would you be looking for?
>
> "[Juror:] You mean if it weren't a friend?
>
> "[Trial Counsel:] Yes.
>
> "[Juror:] Yes. Well, if it weren't a friend, I'd be—if I—the weapon wasn't there, I'd need other evidence. I'd need a—a witness or something. I mean just the word wouldn't be enough for me."

It was not unreasonable for trial counsel to believe that Juror Ten had recognized the same distinction. Moreover, trial counsel did not simply ignore Juror Ten's statement. Rather, he spent time during *voir dire* discussing the dangers of "find[ing] somebody guilty of a crime based solely on an accusation." That discussion allowed trial counsel an opportunity to observe Juror Ten and further evaluate her fitness for the jury.

Trial counsel's affidavit indicates that his observation of Juror Ten led him to believe that she could evaluate the case impartially. We cannot say on this record that that was not a reasonable conclusion for him to reach. Moreover, petitioner presented no evidence beyond the *voir dire* transcript to substantiate his claim that Juror Ten was actually biased. Petitioner did not prove either that Juror Ten was actually biased or that trial counsel failed to exercise reasonable professional skill and judgment when he allowed Juror Ten to remain on the jury.

In addition to his argument regarding Juror Ten, petitioner claims that trial counsel committed other errors that prejudiced him. As we shall explain, we reject those claims for several reasons.

■■ Many of the acts or omissions by trial counsel that petitioner asserts to be mistakes either did not occur as petitioner describes them or, in context, do not constitute lapses of professional skill and judgment. For example, petitioner alleges that trial counsel should not have allowed the state to present the motion *in limine*. However, the state's "presentation" of that motion largely consisted of a statement of the state's concessions in response to the motion, each of which benefitted petitioner. Petitioner also claims that trial counsel should not have reserved his arguments on Measure 11 and Measure 40. However, trial counsel's reservation was at the behest of the trial judge, the state conceded petitioner's argument that Measure 40 did not apply to the case, and the trial court ruled that it would follow the decisions of the motions panel regarding Measure 11. In addition, petitioner claims that trial counsel negligently failed to pursue a "no contest" plea agreement and that petitioner would have accepted such an agreement. Trial counsel, however, stated that petitioner refused to allow him to negotiate a plea agreement, adamantly insisting on his innocence. Petitioner's bare assertion that he would have accepted a favorable plea agreement is insufficient to carry his burden of proving that trial counsel failed to provide adequate representation.

■■ Other actions of trial counsel that petitioner cites as error constituted reasonable tactical choices and, therefore, do not demonstrate a lack of professional skill or judgment. For example, as previously noted, trial counsel (with petitioner's agreement) alluded to petitioner's incarceration in the hope of eliciting the jury's sympathy. That tactic, although perhaps misguided, is not necessarily error. *See Estelle v. Williams*, 425 US 501, 508, 96 S Ct 1691, 48 L Ed 2d 126 (1976) (holding that defendant who appeared before jury in prison uniform had received fair trial because he was not compelled to appear in that manner and noting that "it is not an uncommon defense tactic to produce the defendant in jail clothes in the hope of eliciting sympathy from the jury"). Similarly, trial counsel's approach to closing argument—including, for example, his decision not to make distinct arguments regarding the separate charges—and his choice to use the defense that petitioner sold his guns to Pedersen were

reasonable tactical choices, even if, as petitioner asserts, they backfired.

We agree with petitioner that trial counsel failed to exercise reasonable professional skill and judgment in several respects. The record reveals that trial counsel appeared to be unaware of the disposition of pretrial motions filed by petitioner's previous counsel. His inexperience and unfamiliarity with the rules of evidence caused the trial court to exclude some proffered testimony that might have been helpful to petitioner and that might have been admitted if he had phrased his questions differently. Trial counsel moved for judgment notwithstanding the verdict, a motion that is unavailable in criminal cases. *State ex rel Haas v. Schwabe*, 276 Or 853, 857, 556 P2d 1366 (1976) ("[N]either under our statutes nor under common law is there any basis for the entry of a judgment n.o.v., or its equivalent, in a criminal case."). He made an oral motion for a new trial, a motion that must be presented in writing. ORS 136.535; ORCP 64 D. However, the post-conviction court determined that none of those lapses prejudiced petitioner, and we conclude that evidence in the record supports that determination.

In summary, we conclude that trial counsel's failure to challenge Juror Ten did not demonstrate that trial counsel failed to exercise reasonable professional skill and judgment in his representation of petitioner. We also conclude that, although trial counsel's conduct of some aspects of the trial fell below the required standard of skill, petitioner has not proved that any of those mistakes had a tendency to affect the result of the prosecution.

B. *Structural Error*

Notwithstanding his inability to prove that any particular error by trial counsel tended to affect the result of the case against him, petitioner nevertheless contends that trial counsel's performance in this case as a whole was so inadequate that it undermined the required "adversarial nature" of the trial. *See United States v. Cronic*, 466 US 648, 656-57, 104 S Ct 2039, 80 L Ed 2d 657 (1984) (Sixth Amendment

rights violated when criminal trial loses its adversarial character). Therefore, petitioner urges this court to apply the doctrine of "structural error" and order a new trial, without requiring him to show actual prejudice.

We first note, however, that structural error is a doctrine that originated in federal criminal cases and, contrary to petitioner's assertions, has not been adopted by this court as an aspect of Oregon law, although this court has discussed structural error on several occasions. *See, e.g.; State v. Barone*, 329 Or 210, 226, 986 P2d 5 (1999) (holding that this court "has not adopted the doctrine of 'structural' or 'systemic' error in analyzing questions of Oregon law"); *State v. Wilson*, 323 Or 498, 505 n 5, 507, 918 P2d 826 (1996) (declining to address defendant's structural error claims); *State v. Cole*, 323 Or 30, 37 n 5, 912 P2d 907 (1996) (declining to consider doctrine of structural error because actual prejudice existed).

Petitioner alternatively urges us now to adopt the structural error doctrine as part of Oregon criminal law. However, as we discuss below in our analysis of petitioner's federal claims, petitioner's trial did maintain its adversarial nature and involved no arguable structural error even under the theory of structural error that petitioner puts forward.

We pause at this point, however, to comment briefly on petitioner's request that this court adopt some form of the structural error doctrine that federal decisions have recognized. As discussed above, petitioner advances his structural error argument as a basis for this court to grant post-conviction relief even if he cannot demonstrate that his trial counsel's lack of professional skill and judgment caused him prejudice. In other words, petitioner offers "structural error" as an alternative to our usual inquiry into whether his trial counsel's acts and omissions at trial were "prejudicial" or, instead, constituted "harmless error." Although petitioner's argument arises in the context of a post-conviction proceeding, the same inquiry is required in direct criminal appeals when we consider whether errors at trial require reversal. *See State v. Davis*, 336 Or 19, 27-35, 77 P3d 1111 (2003) (discussing "harmless error" analysis). Despite petitioner's carefully reasoned argument in favor of the structural error doctrine, we do not find the concept helpful in determining

whether, in an Oregon criminal trial, legal error should result in reversal or whether, in a post-conviction proceeding, trial counsel's mistakes should lead to a new trial.

The term "structural error," of course, appears in no statute or constitutional provision, and the substantive content of the term, as developed in the federal cases, is elusive. Indeed, the term appears to state a conclusion more than to provide an analytical framework for deciding cases. More significantly, the addition of the abstract adjective "structural" to the commonly used legal term "error" diverts attention from the critical task of determining the existence and nature of any legal errors at trial. In our view, the latter inquiry provides the more appropriate focus and allows a reviewing court sufficient scope to determine whether legal errors at trial were prejudicial or harmless. In *Davis*, for example, this court considered whether the trial court's exclusion of certain evidence was prejudicial by closely examining the "nature of the error" and its context, including its relationship to defendant's factual theory of the case. 336 Or at 32-34. Similarly, in *Cole*, the defendant, without making a valid waiver of his right to counsel, represented himself at a suppression hearing. In rejecting the state's argument that the lack of counsel was harmless, this court reviewed the context in which the right to counsel was denied, the elements of the charges against defendant, and the evidence at trial. *Cole*, 323 Or at 36-37.

Finally, we note that the structural error doctrine, at least as articulated by the federal courts, is not consistent with Article VII (Amended), section 3, of the Oregon Constitution. That section provides, in part:

> "If the supreme court shall be of opinion, after consideration of all the matters submitted, that the judgment of the court appealed from was such as should have been rendered in the case, such judgment shall be affirmed, notwithstanding any error committed during the trial * * *."

This court consistently has held that, under that provision, we "must affirm a judgment, despite any error committed at trial, if, after considering all the matters submitted, the court is of the opinion that the judgment 'was such as should have been rendered in the case.' " *Davis*, 336 Or at 28. Under

Article VII (Amended), section 3, the test for affirmance despite error consists of a single inquiry: "Is there little likelihood that the particular error affected the verdict?" *Id.* at 32.

Obviously, the nature of an error will dictate how much or how little it will take to satisfy us that the error affected the verdict. *See, e.g., Cole* (prejudicial error when defendant denied counsel at suppression hearing); *State v. Cavan*, 337 Or 433, 98 P3d 381 (2004) (prejudicial error when defendant's jury trial for attack on prison guard held in prison where attack occurred). In our view, however, the foregoing discussion demonstrates that the structural error doctrine would not provide a useful analytical tool for Oregon courts to use in determining whether legal error in a trial proceeding should result in reversal. This court's cases discussing prejudicial and harmless error appropriately apply the controlling constitutional requirements and provide sufficient guidance to lower courts and counsel.

## IV. FEDERAL CONSTITUTIONAL CLAIMS

A. *Structural Error*

 Petitioner asserts that the mistakes made by his trial counsel demonstrate that his trial was tainted by structural error and that that doctrine obviates the need for a showing of prejudice.[9] In *Chapman v. California*, 386 US 18, 87 S Ct 824, 17 L Ed 2d 705 (1967), the Court held that constitutional errors, like other errors, could be subject to harmless error analysis. *Id.* at 22. However, it noted that some constitutional errors, such as deprivation of the right to counsel, could never be considered harmless. *Id.* at 24 n 8. Twenty years later, the Court reiterated its view that most constitutional errors could be reviewed for harmless error, but

---

[9] The federal precedents do not always distinguish between "structural error" and "presumed prejudice." As we discuss below, the earlier cases speak in terms of presumed prejudice or prejudice *per se*, while more recent decisions use the phrase "structural error." As we noted at the outset, however, for the purposes of this case those doctrines can be treated as identical. We therefore discuss the relevant federal cases together to present a clear picture of the precedents regarding ineffective assistance of counsel.

excluded denial of the right to counsel from that list. *Rose v. Clark*, 478 US 570, 579, 106 S Ct 3101, 92 L Ed 2d 460 (1986).

Decisions after *Chapman* and *Rose* sharply distinguish between trials in which the defendant was denied the right to counsel, either actually or constructively, and cases in which the defendant received the assistance of counsel, but that counsel was ineffective. The Court in *Strickland v. Washington*, 466 US 668, 104 S Ct 2052, 80 L Ed 2d 674 (1984), painted a stark distinction between the two, noting that "[a]ctual or constructive denial of the assistance of counsel altogether is legally presumed to result in prejudice," *Strickland*, 466 US at 692, but that "actual ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice," *id.* at 693.

The Court highlighted that same distinction in *Cronic*, decided the same day as *Strickland*. There, it stated:

> "When a true adversarial criminal trial has been conducted—*even if defense counsel may have made demonstrable errors*—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated."

*Cronic*, 466 US at 656-57 (emphasis added). The Court noted three circumstances in which prejudice is presumed: the complete denial of counsel, a representation that "entirely fails to subject the prosecution's case to meaningful adversarial testing," and cases in which outside circumstances make effective assistance impossible. *Id.* at 659-60.

The Court first used the term "structural error" in *Arizona v. Fulminante*, 499 US 279, 111 S Ct 1246, 113 L Ed 2d 302 (1991), when it considered whether a defendant needed to prove that the introduction of a coerced confession had prejudiced him. The Court stated that a defendant could prevail without showing prejudice only if he complained of a "structural error," which it defined as an error that "def[ied] analysis by 'harmless-error' standards" and skewed the trial's ability to determine guilt or innocence reliably. *Id.* at 309-10. The Court cited five examples of structural error, including the *"total deprivation* of the right to counsel at

trial."[10] *Id.* at 309 (emphasis added). The Court concluded that the admission of a coerced confession did not constitute a structural error.

The Court revisited the application of the structural error doctrine to a claim of ineffective assistance of counsel in *Bell v. Cone*, 535 US 685, 122 S Ct 1843, 152 L Ed 2d 914 (2002). The Court reaffirmed its holding in *Cronic*, rejecting a habeas corpus petitioner's argument that the court should *presume* prejudice in his ineffective assistance claim: "When we spoke in *Cronic* of the possibility of presuming prejudice * * *, we indicated that the attorney's failure must be *complete.*" *Bell*, 535 US at 696-97 (emphasis added).

■ The Court's precedents are clear. A defendant who chooses to assert a Sixth Amendment ineffective assistance of counsel claim without proving prejudice must demonstrate that trial counsel's errors were so egregious as to amount to a constructive denial of counsel.

Petitioner's claim does not meet that standard. Although, as we described in detail above, trial counsel made certain mistakes, in fact, his performance served petitioner's interests in many ways. His motion *in limine* forced the state to address and agree to omit potentially damaging evidence, such as petitioner's convictions for DUII and solicitation. He successfully moved to dismiss the theft charge. He cast doubt on Siemens' testimony about petitioner's confession by presenting testimony that Siemens had been drinking heavily during their conversation. He emphasized the suspicious fact that Dobbins had "forgotten" to tell the investigating officer about petitioner's surprising confession during the first interview. He presented testimony that petitioner's guns did not match the victim's description. He argued that it would have been illogical for petitioner to harm the victim when he risked discovery by the client who was soon to arrive.

We agree with the post-conviction court that the errors petitioner enumerates did not affect the adversarial nature of the trial. Therefore, we hold that his petition fails to

---

[10] The Court's other examples included the presence of a biased judge, the exclusion of jurors of the defendant's race, the denial of the defendant's right to self-representation, and the right to a public trial. *Id.* at 310.

demonstrate structural error as that concept has been articulated by the United States Supreme Court.

## B. *Ineffective Assistance of Counsel*

As we already have noted, petitioner claims that his trial counsel was ineffective because, *inter alia*, he failed to challenge Juror Ten. The federal constitutional standard for ineffective assistance of counsel is set out in *Strickland*, 466 US at 687, and it requires a convicted defendant to show that "counsel's performance was deficient" and that that deficient performance "prejudiced the defense." Although the Article I, section 11, standard and the federal standard are not identical, the reasons stated above for denying petitioner's state claim are sufficient to deny his federal claim as well. Petitioner has not shown that trial counsel's performance was "deficient" in failing to exclude Juror Ten or that the mistakes trial counsel did make prejudiced him. Petitioner's federal claims fail.

The decision of the Court of Appeals and the judgment of the circuit court are affirmed.