Argued and submitted April 22, 1999, reversed and remanded March 22, 2000

# STATE OF OREGON,
*Appellant,*

*v.*

# MATTHEW FRANK HALL
## and Linda Bremer,
*Respondents.*

## (97-1585-C-2; CA A98283)

999 P2d 509

Jonathan H. Fussner, Assistant Attorney General, argued the cause for appellant. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Jesse Wm. Barton, Deputy Public Defender, argued the cause for respondents. With him on the brief was David E. Groom, Public Defender.

Before Haselton, Presiding Judge, and Deits,* Chief Judge, and Wollheim, Judge.

WOLLHEIM, J.

---

* Deits, C. J., *vice* Warren, S. J.

## WOLLHEIM, J.

The state appeals from an order suppressing methamphetamine and drug paraphernalia discovered when officers executed an initial search warrant for the arrest of defendant Hall. The trial court held that the suppression was required both because the state failed to prove the existence of the two search warrants in this case and because the initial search of defendant's home in which the drugs and paraphernalia were discovered was pretextual. On review for errors of law, we reverse and remand.

The relevant facts are as follows. On April 9, 1997, pursuant to a search warrant, officers with the Jackson County Narcotics Enforcement Team (JACNET) and Special Emergency Response Team (SERT), entered and searched defendants' residence to arrest Hall on outstanding warrants for his arrest. Officers eventually located and arrested Hall in a downstairs room of the residence. During the search of an upstairs room of the residence for Hall, Officer Havice, a member of the SERT team, discovered in plain view methamphetamine and drug paraphernalia. Based on those observations, the officers obtained a second warrant and subsequently searched the residence for drug evidence. Defendants were then charged with possession, manufacture, and delivery of a controlled substance, ORS 475.992, endangering the welfare of a minor, ORS 163.575, child neglect, ORS 163.547, and conspiracy to manufacture and deliver a controlled substance, ORS 161.450.

Defendants filed a motion to suppress the methamphetamine and drug paraphernalia. In the motion to suppress, the only argument made was that Havice exceeded the scope of the initial search warrant because, upon entry of the house, the officers were immediately informed of Hall's whereabouts downstairs and Havice conducted the search of the upstairs room after Hall was placed into custody. Defendants did not file the required motion supported by affidavit, pursuant to ORS 133.693(2), to controvert the affidavit for the second search warrant for drug evidence. They argued simply that, because the "second search warrant was issued based upon evidence discovered during the first search" and

because that discovery was the result of Havice exceeding the scope of the initial search for Hall, "[a]ll evidence found during the upstairs search must be suppressed." Thus, defendants apparently relied on *former* ORS 133.683,[1] that evidence derived from illegal conduct cannot properly be relied on to supply probable cause for a search warrant. *State v. Morrison/Bartce*, 107 Or App 343, 349, 812 P2d 832, *on recons* 108 Or App 766, 816 P2d 1217 (1991). Defendants asserted that, without that information, the affidavit failed to provide probable cause. *See State v. Binner*, 128 Or App 639, 646, 877 P2d 642, *rev den* 320 Or 325 (1994) ("When an application includes constitutionally tainted information, the correct action is for the magistrate and reviewing court to excise from the application all such information and to determine whether the remaining information is sufficient to establish probable cause."); *State v Hitesman/Page*, 113 Or App 356, 359, 833 P2d 306, *rev den* 314 Or 574 (1992). In response, the prosecutor argued that the initial search was permissible in scope for officer-safety reasons and that Havice did not learn of Hall's arrest until after Havice searched the upstairs room.

At the hearing on the motion to suppress, Detectives Brown and Thomson, assigned to JACNET, testified. Thomson testified that he had received information that Hall was living in the area and might be involved in an illegal drug operation. Thomson explained that he had learned that there were existing outstanding arrest warrants for Hall in Jackson County and in Idaho and that he had also received information from the California Bureau of Narcotics Enforcement (BNE) concerning Hall's criminal history. Thomson stated that an agent from the California BNE described Hall as

"a dangerous individual; that they've arrested him several times over the course of several years; and that every time they've run into him, he's always armed, always got a gun with him. Several of his arrests on his criminal history indicate that he's been arrested while in possession of controlled substance while being armed."

---

[1] ORS 133.683 was repealed by Senate Bill 936, Or Laws 1997, ch 313, § 37, effective July 1, 1999; thus the repeal does not affect this case.

Thomson also stated that Hall's record indicated several arrests for assault with a deadly weapon.

Brown testified that he then placed defendants' residence under police surveillance. During that time, Brown identified Hall at the residence. Police also saw three other males and two females at the residence. Brown explained that he identified Hall when Hall was outside of the residence but did not arrest him at that point because it was not practical or safe. In particular, Brown explained that he and other officers "were some distance away" from defendant and that "due to his violent history that we were aware of, it wasn't, in our opinion, safe for two officers or three officers without body armor, et cetera, to initiate arrest on him." After identifying Hall at the residence, Brown testified that he obtained a warrant to search the residence for Hall to make the arrest. Thomson testified that, although he and Brown had their suspicions that Hall was involved in drug activity in the home, Thomson's interest in executing the search warrant was to arrest Hall on the outstanding arrest warrants.

The detectives testified that they decided to use SERT to execute the search warrant for Hall's arrest "[b]ased on [Hall's] history of being armed; * * * [and] arrests [for] assault with deadly weapons in his past," and "due to Mr. Hall's potential for violence and the fact that there may be weapons in the residence." Havice testified that SERT is a specially trained team used for high risk situations where ordinary patrol officers would not be safe. He explained that, during the execution of the search warrant for Hall's arrest, he wore additional body armor and protective head and eye gear and carried a fully automatic 9mm submachine gun with a light attached. He communicated with other officers by radio but could not hear other members elsewhere in the house unless broadcast over the radio. Havice explained that the SERT team members were briefed about Hall's history involving violence and weapons possession.

Havice also described the initial search. He explained that the eight-man SERT team made a "dynamic" entry into the residence, announcing their presence as police officers as they entered the house. Each pair of officers was

assigned to a particular area of the house to sweep simultaneously for Hall's presence. Havice testified that the "sweep" was also intended to "secure" the residence for "safety factors of the team and other members inside the residence." Thus, when a team member encountered a person in the residence, he or she was required to remain with that person until the search was over.

Havice testified that he was the fourth officer who entered the residence and that he cleared the kitchen area with a quick visual check to be sure no one was in the kitchen. Havice explained that his partner encountered defendant Bremer in the hallway. Havice stated that he then proceeded upstairs with another officer to clear the two rooms upstairs. Havice explained that, after clearing the first room, he and the other officer entered a doorway into the second room. He described that room as dark, containing a computer desk and numerous boxes and files, and having a sheet of black plastic stretched across the room from wall to wall. Looking into the room with the lights attached to their weapons, Havice saw no one but surmised that someone could be hiding behind the black plastic.

Havice explained that, to look behind the plastic, he had to cross the room. As he crossed, Havice stated that he shined his light on the computer desk and surrounding area and there observed an electronic scale with "powdery residue" on it. He also stated that he saw a cooler with the top propped open and inside was a large clear plastic bag containing a white powdery substance, which appeared to be methamphetamine. When asked on cross-examination whether he was at that point searching the front part of the room for Hall, Havice answered that he was not, but that, "[i]n order to proceed through the room" to examine behind the plastic, he was searching for trip wires and any sort of "booby trap."

Next, Havice explained that he and his partner tore down the plastic sheet and shined their lights into the part of the room behind it to make sure no one was hiding there. Havice testified that, at that point, he heard a radio transmission indicating that a suspect had been placed into custody and requesting a photo of Hall for identification of the

suspect. According to Havice, he then stopped searching the room and proceeded back downstairs. He estimated that his search through the house lasted 30 to 40 seconds.

Bremer testified that when the police entered the residence, she met them in the hallway and immediately told them that Hall was in the bathroom, the room farthest from the police's point of entry into the house. She indicated that some officers proceeded directly to that room, but that only one officer proceeded upstairs. She believed that the officer who proceeded upstairs should have heard her statement concerning Hall's whereabouts. She could not identify whether that officer was Havice. She estimated that the search for and arrest of Hall took approximately one to two minutes.

Neither the first nor the second search warrant and supporting affidavits were introduced into evidence at the hearing. In closing argument, defendants pointed out that neither warrant was in evidence. The following exchanges then took place:

"[COURT]: In all the years I've been doing this, this is the first motion to suppress where the warrant which they were executing has never been offered into evidence. It's not a part of the court record. I do not have a warrant, and this was a warrant search, and I don't have a warrant. At this point the only finding I can make is this was a warrantless search and, therefore, illegal.

"[PROSECUTOR]: Well, then I'd ask for time to get the warrant, Your Honor.

"[COURT]: This is the time set for the hearing. And I have another concern, too. You know, we've had testimony of the dangerousness of this person, and I can take judicial notice of the court's own record. I have the release assistance information. There is nothing to indicate [Hall's] ever been convicted or arrested on any violent crime.

"* * * * *

"[PROSECUTOR]: You've heard testimony by the officers in this case, Your Honor.

"[COURT]: I know. I'm just saying that * * * I'm concerned also about the fact that he was seen outside, and they didn't make an arrest.

"* * * * *

"It * * * looks to me it's a pretext arrest to get inside that house.

"* * * * *

"I don't even have to go that far. I don't have a warrant in evidence. I have absolutely no evidence in this case to show that there was a warrant issued. So I'm going to suppress on the basis there was no evidence of a warrant."

In its written findings, the trial court ruled that the state "failed to meet its burden of proving a lawful search by failing to introduce either search warrant or supporting affidavit into evidence." The court ruled, alternatively, that if the initial entry was made with a search warrant, then the entry "was a pretext since Defendant Hall had been outside the house and the police could have arrested him without entering the residence."

On appeal, the state makes two assignments of error. First, the state contends that the trial court erred in granting the suppression motion. It argues that granting the motion on the grounds that the state failed to introduce copies of the warrants and affidavits was error because: (1) defendants' motion did not apprise the state that defendants were challenging the existence or validity of the search warrants; (2) the trial court could have taken judicial notice of the warrants; and (3) the trial court refused to allow the state a continuance to obtain copies of the warrants. On the court's alternative basis for its ruling, the pretextual search conclusion, the state argues that the scope of the initial search was lawful for officer safety reasons. Second, the state contends that the trial court erred in denying the state's motion for the court to reconsider its ruling on the motion to suppress, which it filed several days after the hearing on the motion.

Historical facts, as found by a trial court, are binding on review if there is evidence in the record to support them.

*Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968). If findings are not made on all such issues, and there is evidence from which such facts could be decided in more than one way, then we will presume that the facts were decided in a manner consistent with the trial court's order. *Id.* Whether the facts support a determination that the officers' search was conducted pursuant to and within the scope of a valid warrant is a question of law. *See id.*

■ Under ORS 133.675, a party may file a motion to suppress evidence because: (1) the search was conducted without a warrant; (2) the execution of the search exceeded the permissible scope of the search warrant; (3) the probable cause for the warrant was not based on information offered in good faith, accurately, or truthfully; or (4) the probable cause for the warrant was impermissibly based on information derived from illegal conduct. A defendant's motion to suppress must reasonably apprise the court and the state of the arguments and authorities relied upon. *See* UTCR 4.060; *see also State v. Sweet,* 122 Or App 525, 529-30, 858 P2d 477 (1993) (court declined to address arguments not raised in defendant's motion to suppress or in the hearing); *State v. Rodriguez,* 115 Or App 281, 285, 840 P2d 711 (1992) (motion to suppress serves function to frame issues that the court will be required to decide and to notify the state of the contentions that it must be prepared to address at the hearing on the motion).

■ If a defendant decides to contest the validity of a warrant, ORS 133.693(2) sets out the required procedures:

> "If the evidence sought to be suppressed was seized by authority of a search warrant, the moving party shall be allowed to contest the good faith, accuracy and truthfulness of the affiant as to the evidence presented before the issuing authority *only upon supplementary motion, supported by affidavit,* setting forth *substantial basis* for questioning such good faith, accuracy and truthfulness." (Emphasis added.)

In such a case, "the burden of proof is on the defendant to show the invalidity of the warrant." *State v. Coatney,* 44 Or App 13, 18, 604 P2d 1269, *rev den* 289 Or 107 (1980); ORS 133.693(3). If, however, a defendant challenges the search as

warrantless because there was no warrant or because a search exceeded the scope of a warrant, "[t]he burden to establish the lawfulness of a warrantless search and seizure is on the state." *State v. Sargent*, 323 Or 455, 461, 918 P2d 819 (1996); ORS 133.693(4).[2]

■ We begin with the trial court's ruling that the state failed to prove the *existence* of the search warrants. If defendants' motion had notified the state that they challenged the searches as warrantless because no warrants were issued, the state would have had the burden of establishing the existence of the warrants. *See State v. Downes*, 19 Or App 401, 404-05, 528 P2d 110 (1974) (if the defendant alleges absence of a warrant, the state must " 'proceed to satisfy its burden either at a hearing on the motion or, at the least, by an affidavit stating facts sufficient, if true, to establish the legality of the search.' " (quoting *State v. Miller*, 269 Or 328, 334, 524 P2d 1399 (1974)). The state could have been required to produce the warrants themselves. However, defendants here never challenged the *existence* of the search warrants. Rather, in their motion to suppress, defendants expressly conceded the existence of both the initial and second search warrants. Their motion to suppress questioned *only* the proper scope of the first search and challenged the subsequent warrant on constitutional grounds.[3] Accordingly,

---

[2] ORS 133.693 provides, in part:

"(3) In any proceeding [to contest the good faith, accuracy and truthfulness of the affiant] under subsection (2) of this section, the moving party shall have the burden of proving by a preponderance of the evidence that the evidence presented before the issuing authority was not offered in good faith, was not accurate and was not truthful.

"(4) Where the motion to suppress challenges evidence seized as the result of a warrantless search, the burden of proving by a preponderance of the evidence the validity of the search is on the prosecution."

[3] In relevant part, defendants' motion to suppress alleged:

"On April 9, 1997, JACNET and [SERT] served a search warrant at 837 Sunrise Avenue for the person of Matthew Frank Hall. * * * According to Detective Brown's affidavit for a second search warrant, Officer Havice searched * * * two [upstairs] rooms while 'searching for Mr. Hall.'

"A second search warrant was issued based upon evidence found during the first search. * * *

"* * * * *

"The initial search warrant in the present case authorized the officers to search for the person of Mr. Hall only. Upon the officers' entrance into the residence, the officers were immediately told of Mr. Hall's whereabouts.

where defendants' motion to suppress and arguments at the hearing *never* challenged the existence of the search warrants and where defendants *conceded* their existence, the state was not obligated to produce the warrants to prove their existence. The trial court erred in concluding otherwise.

█ We next consider the court's alternative basis for granting the motion to suppress: the initial search of the house was pretextual and therefore unlawful. The trial court, in essence, made a negative credibility finding regarding Thomson's and Brown's, testimony based on the facts that: (1) they were assigned to JACNET; (2) they had suspicions regarding Hall's current drug activities; (3) they had declined an earlier opportunity to arrest Hall outside of his residence; and (4) the court's *written* record on Hall presented no evidence of his dangerousness. Thus, the trial court reasoned that the information the detectives offered as the basis for obtaining a search warrant to effect Hall's arrest was not offered in good faith, accurately, or truthfully. The court's ruling goes to the sufficiency of the affidavit establishing probable cause for the issuance of the *initial search warrant* by the magistrate.

However, defendants' argument challenged only the scope of the initial *search* and the related validity of the *second search warrant*, not the validity of the initial warrant. Defendants did not file a supplemental motion, supported by affidavit, to controvert any information in the initial affidavit supporting probable cause to issue the first search warrant. ORS 133.693(2). We therefore decline to reach that issue and conclude that the trial court erred in raising and ruling on the issue of the detectives' good faith and the sufficiency of the affidavit for the initial warrant.[4] *See Sweet*, 122 Or App at 529-30.

---

Mr. Hall was handcuffed in custody within 1-2 minutes of the officers' arrival. Officer Havice's search of the upstairs finished and unfinished rooms was conducted after Mr. Hall had already been taken into custody. Officer Hall exceeded the scope of the warrant. All evidence found during the upstairs search must be suppressed."

[1] We note that the trial court, in effect, found information controverted in an affidavit that it did not have in evidence. That fact underscores our conclusion that the trial court erred in considering an argument not raised by defendants in a supplemental motion supported by affidavit and where they bear the burden of proof. ORS 133.693(2), (3).

■ We finally turn to the only argument properly before the trial court that defendants made in their motion to suppress and that could provide an alternative ground for affirmance—that Havice exceeded the scope of the initial search warrant. Because the trial court did not reach the merits of this argument, we first address the preliminary matter of what issues we may consider on appeal. Where resolution of an unaddressed issue requires examining and deciphering disputed facts, we, as a general rule, must normally remand the issue to the trial court for development of a factual record and for findings of fact. *See State v. Herrera-Sorrosa*, 155 Or App 227, 229, 963 P2d 728 (1998) (the court held, on reconsideration, that in its earlier opinion it had improperly inferred that the trial court resolved disputed facts consistently with an analysis that the trial court never considered); *see also State v. Denny*, 158 Or App 616, 622, 978 P2d 1014 (1999) (remand required where trial court did not consider the issue of consent, which was critical to resolution of the defendant's constitutional argument as relevant under ORS 136.432). However, where the record is sufficiently developed and permits only one conclusion, we may resolve the issue on appeal. *See State v. Cruz-Aguirre*, 158 Or App 15, 21-22, 972 P2d 1206 (1999) (determining that the trial court's exclusion of evidence was error under ORS 136.432, although that statute was enacted after the trial court had ruled, where evidence in record relevant to that determination was sufficient and uncontradicted).

As framed in their motion to dismiss, defendants argued only that Havice exceeded the scope of the search warrant in continuing to search the house after defendant had already been arrested. Accordingly, defendants did not question whether the terms of the warrant could be interpreted to permit the police conduct in question. Rather, defendants argued that, once Hall was arrested, the search warrant expired, and any searches thereafter were warrantless. The terms of the warrant are not necessary for our resolution of defendants' argument, nor was the state required to produce the initial warrant into evidence.

■ The state argues that the search was conducted pursuant to a permissible "protective sweep" of the premises for officer safety. *See State v. Cocke*, 161 Or App 179, 984 P2d

321 (1999), *rev allowed* 329 Or 650 (2000). We need not address the state's argument because we hold that the search was conducted in execution of the warrant.[5] *Former* ORS 133.585[6] describes the scope of a permissible search under a warrant in this case and provides that, "[u]pon discovery of the persons or things so specified, the officer shall take possession or custody of them and search no further under authority of the warrant." The record sufficiently establishes that the police were properly on the premises executing a warrant to search for Hall.

The record also indicates that, at most, Havice did, in fact, hear Bremer inform Havice's partner that Hall was in the bathroom, located at the back of the house, and that officers proceeded to that location, while Havice and another officer proceeded upstairs. Defendants argue that, as soon as Havice heard from Bremer that Hall was in the back, he was authorized to proceed to only that location and none other. We disagree.

Havice testified that he was told that Hall had a history of violence and weapons possession. The record is sufficient for us to conclude that such a belief was objectively reasonable. *See State v. Toevs*, 327 Or 525, 535, 964 P2d 1007 (1998) (determination of objective reasonableness requires independent assessment of the facts by appellate court). Although Havice did not personally examine Hall's history, Havice received that information during an official briefing regarding the incident that one could reasonably believe would provide reliable information. Given that history, Havice had no reason to know that Hall was not "lurking" in

---

[5] The "protective sweep" cases are premised primarily on search incident to arrest and officer-safety considerations. *See Cocke*, 161 Or App at 184. Those cases

"authorize[ ] officers, when making an in-home arrest, to take reasonable steps to protect themselves if the officer has a reasonable suspicion, based on specific and articulable facts that there could be persons present posing an immediate threat of danger to the officers or others. Such steps can include cursory searches of areas of a home beyond the immediate reach of the arrestee." *Id.* at 190.

Although this case also relies on some officer-safety concerns, the distinction here is our conclusion that the search was for the arrestee and pursuant to a warrant, rather than for persons other than the arrestee and incident to that arrest.

[6] ORS 133.585 was repealed by Senate Bill 936, Or Laws 1997, ch 313, § 37, effective July 1, 1999; thus the repeal does not affect this case.

another area of the house "armed, or poised for flight." *State v. Chinn,* 231 Or 259, 271, 373 P2d 392 (1962).

> "In the course of their dangerous duty, police officers are entitled to look to their own security and to make reasonable efforts to check upon the veracity of a suspect's friends or relatives who [purport to identify a suspect's whereabouts]." *Id.*

Accordingly, it was objectively reasonable for some officers to proceed to the back of the house and for Havice to continue through the house.

Similarly, the record is sufficient for us to conclude that there is no way that Havice objectively should have known of Hall's arrest until he was informed by radio. It is undisputed that Hall was not yet in custody when Havice proceeded upstairs and out of ear shot of the activities downstairs. It is also undisputed that the only way that Havice, while upstairs, could have learned of Hall's actual arrest was by the radio attached to his uniform.

However, the record is deficient with regard to determining whether Havice actually knew of Hall's arrest before he searched the room. That determination rests ultimately on Havice's credibility, particularly whether we believe Havice's testimony that he was searching for Hall upstairs and that he did not learn of Hall's arrest on the radio until after searching the second room upstairs. Because the trial court did not consider this argument, it made no explicit credibility findings regarding Havice. Nor may we assume, as defendants argue, that the trial court made implicit findings regarding Havice's credibility. *See Ball,* 250 Or at 487. The trial court's negative credibility findings pertain only to the detectives, which do not transfer to Havice's credibility: Havice was not involved in the drug investigation. He simply executed the warrant based on the information provided by the detectives and other officers.

We normally defer to a trial court's findings of credibility where they are based on an opportunity to see and hear witnesses. *State v. Cox,* 43 Or App 771, 773, 604 P2d 423 (1979), *rev den* 288 Or 527 (1980). That is especially true

where, as here, credibility based on demeanor is a crucial factor in making an appraisal of the evidence. *See Wales v. Lester*, 267 Or 379, 382, 517 P2d 281 (1973). Although we find nothing in the record to cast doubt directly on Havice's credibility, there is some discrepancy in the evidence regarding the length of time Havice remained upstairs. We cannot say with absolute certainty that a factfinder, after viewing the demeanor of Havice, weighing his interest in executing the warrant, and considering that factual discrepancy, could not, as a matter of law, find that Havice lacked credibility. We therefore cannot resolve the issue of Havice's credibility on appeal. Accordingly, on remand the court must decide the issue of the permissible scope of Havice's search based on its determination of Havice's credibility.

In summary, we hold that the trial court erred in suppressing the evidence on the ground that the state failed to prove the existence of the search warrants and that the initial search of the house was pretextual. On the only ground properly before the court, whether the search exceeded the permissible scope of the initial warrant, we remand on the narrow issue of Havice's credibility. On remand, if the trial court concludes that Havice is credible, we instruct the court that it must deny defendants' motion to dismiss on the ground that Havice exceeded the scope of the initial search warrant.

Given our disposition of the state's first assignment of error, we need not address its second assignment of error.

Reversed and remanded.