Submitted July 31, 2013, affirmed August 20, petition for review denied
December 11, 2014 (356 Or 575)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL JAMES RUSSUM,
*Defendant-Appellant.*

Multnomah County Circuit Court
100431632; A147589

333 P3d 1191

Peter Gartlan, Chief Defender, and Marc D. Brown, Deputy Public Defender, Office of Public Defense Services, filed the opening brief, supplemental brief, and reply brief for appellant. Michael James Russum filed the supplemental brief *pro se*.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Rolf C. Moan, Assistant Attorney General, filed the briefs for respondent.

Before Duncan, Presiding Judge, and DeVore, Judge, and Schuman, Senior Judge.

DEVORE, J.

**DEVORE, J.**

In this case we consider whether defendant can be prosecuted after a jail official and a detective have opened mail to or from his attorney. Defendant appeals a judgment of conviction on four counts of first-degree sodomy, ORS 163.405, assigning error to the denial of his motion to dismiss the indictment with prejudice. Defendant moved to dismiss after learning that a detective had inadvertently read part of a letter that defendant had sent to his attorney and finding that other letters to or from his attorney had been opened. Defendant argued below that the interference with confidential communications violated his right to counsel under the state and federal constitutions. The court denied the motion on the grounds that the intrusions produced no tainted evidence and that the prosecution itself received no privileged information. As a precaution, the court limited the scope of the detective's testimony at trial. That testimonial limitation is not challenged.

We review a motion to dismiss for errors of law. *See State v. Penrod*, 133 Or App 454, 459-60, 892 P2d 729 (1995) (applying that standard to an officer's intrusion into attorney-client communications); *see also State v. Loza*, 244 Or App 71, 76, 260 P3d 555 (2011) (motion to dismiss). We defer to the trial court's findings that are supported by evidence in the record, and, if there are no express findings of fact with respect to disputed factual issues, we presume that the facts were decided in a manner consistent with the trial court's decision. *State v. Potter*, 236 Or App 74, 82, 234 P3d 1073 (2010). We reject defendant's arguments that prejudice must be presumed or that prejudice was shown under these circumstances, and, to the extent that the state intruded into defendant's communications here, we conclude the trial court did not err in denying dismissal. We affirm.

The relevant facts are undisputed, even if not fully explained. The events began when defendant's eight-year-old step-daughter, K, disclosed on April 5, 2010, that defendant had engaged in sexual conduct with her. K's mother spoke with Gresham Police Detective Hickey. Defendant was arrested on April 20, and indicted on four counts of first-degree sodomy. Defendant was held in jail while he

awaited trial. The jail's Inmate Manual sought to protect the confidentiality of certain mail by permitting the inmate to write the words "Legal Mail" on the envelopes of outgoing mail. Otherwise, all other mail "may be read, inspected, and copied." Incoming mail, which is "clearly marked" from an attorney or a law firm, may be opened and inspected for contraband in the inmate's presence. The manual lists forbidden contraband items, ranging from personal checks, stamps, or tape to drugs, escape plans, or communications "restrained" by the court.

Hickey suspected that defendant was sending letters through his grandfather to influence K's mother, a potential witness. Hickey filed a "Request for Inmate Mail Monitoring" with Multnomah County Corrections Deputy Watts, who coordinated the jail's mail-monitoring program. Per the request, jail staff began opening defendant's mail and scanning its contents into the jail's computer system. In early July, Hickey received the first response from Watts. It was an e-mail with 30 to 50 attachments, consisting of defendant's mail from June 1 to July 1. Each attachment was a scan of an envelope or a single page of a letter. In early August, Hickey received a second e-mail from Watts containing another batch of defendant's mail. He opened the attachments in no particular order. While reading one, Hickey became curious "who [defendant] was telling this particular piece of information to." Hickey opened the preceding page to determine the letter's recipient and discovered that the letter was intended for defendant's attorney Barnett. The letter's envelope had not been marked as "Legal Mail," and it did not address the recipient as an attorney.

Hickey immediately contacted the prosecutor, Deputy District Attorney Casalino, to explain the situation. The prosecutor instructed Hickey not to communicate any contents of the letter to him and to seal it and await further instructions. Hickey printed the letter, sealed it in an envelope, and mailed it to defense counsel's office.[1] He deleted the

---

[1] When the detective learned that defense counsel never received the subject letter from him, he asked Watts to email him the scan of only the envelope to defendant's letter. Watts was unable to separate that particular attachment and instead re-sent the entire batch. Hickey realized that Watts had sent the

files from his computer and the e-mail that contained the attachments. The prosecutor e-mailed Barnett to explain the circumstances. Barnett told defendant about the situation but said that it was probably a mistake and not to worry about it. A third batch of defendant's letters was sent to Hickey without incident. The monitoring request expired on August 27, and the last piece of mail Hickey received was dated August 26.

Some time later, Barnett examined two or three envelopes he had received earlier from defendant and saw they had been opened and taped closed before he had received them.[2] Defendant also discovered that a letter, postmarked July 27 and sent to him from his previous attorney, had been opened and resealed. The envelope had a law office as a return address. Another letter, which defendant had mailed to Barnett with a bad address and a postmark of September 15, was returned to defendant at the jail's mail call. It was marked "Return to Sender" and had been opened outside of defendant's presence.[3] A jail deputy verified that the mail had been opened, and it was addressed on the outside as "Legal Mail."[4] Defendant found that another letter, postmarked November 3, from Barnett to him, had been opened outside of his presence. On the outside of the envelope was written "Opened in Error K Parker." In sum, one unmarked letter, a portion of which Hickey inadvertently read, was opened, and five or six envelopes with the inscription "Legal Mail" were opened and resealed.

---

entire batch of defendant's mail, which likely contained the letter from defendant to Barnett. He did not open any of the attachments and again contacted the prosecutor to report what had happened. The prosecutor told Hickey not to do anything and Hickey did not delete the e-mail. Again, the prosecutor e-mailed defense counsel to explain what happened.

[2] Barnett attested to three letters having been opened before receipt. He offered two envelopes in evidence. A photocopied duplicate of one of the two envelopes was an additional, third exhibit.

[3] Defendant filed a grievance regarding the letter, writing, "This is the second occurrence as my attorney was notified of an earlier breach of legal mail. My constitutional and civil rights have been transgressed and I am now unable to continue legal correspondence due to fear that my rights will continue to be breached."

[4] Barnett's address does not indicate a law firm, but the words "Legal Mail" do appear, albeit in fine point pencil in the bottom left corner of the envelope in letters about an inch long and a quarter inch high.

Defendant filed a motion to dismiss the indictment with prejudice based on the intrusions into his correspondence with his attorneys. In his affidavit, he stated, "I am now afraid to correspond with my attorney because I believe that the attorney[-]client privilege has been intruded upon by the State, and that I am now at an obvious disadvantage in my defense." At a hearing on his motion on November 8, defendant testified that all of the letters contained trial strategy, lists of witnesses, and potential weaknesses with the state's investigation.

Hickey explained that the envelope for the letter, which he had begun to read, was not marked as "Legal Mail." He testified that he did not change his investigation or act on the information in the letter. By the time he saw the letter in August 2010, he had already completed the interviews in the case. He had interviewed defendant, the victim's mother, and three other witnesses. That investigation culminated in the arrest of defendant in April 2010, about four months before he saw the letter. Hickey reported that he did not share the letter's contents with the prosecutor or any other law enforcement officers. Hickey added that he had not seen any of the other attorney-client correspondence that had apparently been opened and resealed. Deputy Watts described the jail's mail-monitoring program and testified that no one outside of the jail would have had access to defendant's mail. No explanation was given for the five or six opened envelopes other than the note on one, "Opened in Error."

The trial court found Hickey and Watts to be credible. The judge explained that:

"Frankly, I find Detective Hickey's credibility was not challenged. I do believe him when he said that he didn't provide the information to the prosecutor and that he didn't change the course of the investigation, he didn't rely on the information.

"* * * * *

"* * * I have his word, who, you know, as I said, I find him to be credible. I appreciate the fact that he went right to the prosecutor in this case, that Mr. Casalino was very forthright about it."

Similarly, the judge indicated, "I find Ms. Watts to be credible ***." Nonetheless, the judge found it "very troubling" that the jail was not following its policy insofar as outgoing "legal mail" had been opened and incoming attorney letters had been opened outside of defendant's presence. The judge identified two problems in dealing with the opened envelopes. First, given the sparse evidence offered, the judge could not tell who had read what, if anything, in the letters and there was no "proof of how they impact this trial." Second, defendant's only requested remedy was dismissal with prejudice. The judge observed that no rule or statute prescribed a remedy for opened mail. She said, by comparison, when a prosecutor improperly comments before a jury on a defendant's right to counsel or to remain silent, the remedy is dismissal without prejudice, typically resulting in a new trial. Here, dismissal without prejudice would be ineffectual, the judge allowed, if compromising confidences had been learned and would only be reused at a new trial. Although no communications were exploited here, defendant asked for dismissal with prejudice, thus precluding retrial. The judge concluded that, "under these circumstances where I don't have any showing of tainted evidence or *** intentional communication of the information that was learned to the prosecutor," the court would not dismiss with prejudice.

The court did respond with a precautionary order. Defendant moved for an order that would bar Hickey from testifying at trial. Instead, the court prohibited the detective from talking about anything in the letter. The court ordered,

> "Detective Hickey is not to testify anywhere close to the subject matter that's in that letter, and if he senses that an answer calls for something related to that, he needs to indicate so and we'll have a conversation about it out of the presence of the jury."

The court urged defense counsel to alert the court if he thought Hickey's testimony was influenced by the letter, at which point an *in camera* review of the letter could be done.[5]

---

[5] At trial, Hickey's testimony was confined to the events leading up to defendant's arrest. He did not testify as to any event after April 20. Defense counsel did not object to any of his testimony and did not seek an *in camera* review or chambers conference.

The case proceeded to trial, and a jury convicted defendant on all four counts of first-degree sodomy.

On appeal, defendant assigns error to the denial of his motion to dismiss with prejudice. He asserts that Hickey's review of a letter and the unexplained opening of several envelopes violated his constitutional right to counsel as protected by Article I, section 11, of the Oregon Constitution.[6] Apparently, the state does not contend otherwise. Because the parties share the premise that the state infringed on defendant's right to counsel, we do as well.[7]

Defendant argues that no showing of actual harm is required because "[p]rejudice must be presumed when the state intrudes upon the attorney-client relationship." (Boldface omitted.) Defendant reasons that the information taken from the letters "becomes so intertwined in the development of the state's case, consciously or unconsciously, it is impossible to separate out the prejudicial information." Defendant prefers that the opening of his mail should be conclusively presumed to have prejudiced him. Alternatively, defendant argues that, if presumed prejudice is rebuttable, then the state failed to rebut it, because the jail and prosecutor are one enterprise with collective knowledge. Finally, if prejudice is not presumed, then it was proved, defendant contends, because defendant perceived his constitutional right to counsel was "impermissibly chilled." Defendant maintains that the only adequate remedy is dismissal of the indictment with prejudice.

The state urges that "a defendant who claims that an Article I, section 11 violation requires dismissal bears the burden of showing that he was prejudiced by the violation[.]"

---

[6] Article I, section 11, of the Oregon Constitution, provides, in part:

"In all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel[.]"

On appeal, defendant cites summarily to the Sixth Amendment to the United States Constitution but does not develop that argument.

[7] The state has made no effort to contend that the detective's inadvertent reading of a portion of an unmarked letter or that the unexplained opening of five or six envelopes by unknown persons did not infringe on the right to counsel. Because it is not briefed or argued, we do not explore or express an opinion on distinctions, if any, to be made in fact or law on which intrusion or what circumstance constitute a violation of the right to counsel.

In support, the state cites *State v. Hall*, 339 Or 7, 34-35, 115 P3d 908 (2005), where the Oregon Supreme Court held that, under Article I, section 9, a defendant must show a "minimal factual nexus" between an unconstitutional seizure of a defendant and a defendant's consent to search, so as to justify suppression of the evidence. In this case, the state argues that the evidence and the trial court's findings reveal that "any constitutional violations did not produce— and were not otherwise linked to—evidence or information that aided the prosecution or prejudiced defendant." In the state's view, defendant is required to demonstrate that prejudice, and he failed to do so here.

For the reasons that follow, we conclude that no presumption of prejudice arises in the absence of evidence of a purposeful intrusion that conveys the content of attorney-client communications to the prosecution. If the intrusion is inadvertent, defendant must offer some evidence to show prejudice to his constitutional rights, such as the disclosure of trial strategy to the prosecution or the production of tainted evidence. If a purposeful intrusion takes and conveys privileged information, it will remain for another case to determine whether prejudice should be conclusive or might be rebutted by an appropriate standard of proof if the state could show that defense strategy or evaluations were not actually communicated to the prosecution, that no evidence resulted from or in response to the privileged information, and that no other compromise of defendant's constitutional rights occurred. We restrict our opinion to the facts now presented to us.

Our review begins with Article I, section 11, of the Oregon Constitution. It provides, "In all criminal prosecutions, the accused shall have the right *** to be heard by himself and counsel[.]" This section was adopted as part of the original state constitution without amendment or debate. Claudia Burton & Andrew Grade, *A Legislative History of the Oregon Constitution of 1857—Part I (Articles I & II)*, 37 Willamette L Rev 469, 519-20 (2001). The text provides no express reference to defendant's right to consult privately with counsel. *State v. Durbin*, 335 Or 183, 190, 63 P3d 576 (2003). Yet, Oregon case law is resolute that "confidentiality is inherent in the right to consult with counsel; to hold

otherwise would effectively render the right meaningless." *Penrod*, 133 Or App at 457. It is elementary that "when an individual has a constitutional right to consult with counsel, that right includes the right to confer privately with counsel." *Durbin*, 335 Or at 190.

The right to confer privately with counsel serves purposes in common with the attorney-client privilege. The privilege is understood to "'encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice.'"[8] *State ex rel OHSU v. Haas*, 325 Or 492, 500, 942 P2d 261 (1997) (quoting *Upjohn Co. v. United States*, 449 US 383, 389, 101 S Ct 677, 66 L Ed 2d 584 (1981)). The importance of full and frank communication has led the Supreme Court to observe, "Lawyers can act effectively only when fully advised of the facts by the parties whom they represent[.]" *State v. Jancsek*, 302 Or 270, 274, 730 P2d 14 (1986).

Unlike other jurisdictions, Oregon has not yet addressed the remedy for an intrusion into an accused's legal mail, but our case law does offer guidance. Defendant's preferred remedy—a conclusive presumption of prejudice coupled with dismissal without retrial—is a call for automatic reversal founded on "structural error." Our courts, however, have rejected the concept of "structural error" under our state's constitution. *Ryan v. Palmateer*, 338 Or 278, 294-97, 108 P3d 1127, *cert den*, 546 US 874 (2005) (rejecting petitioner's argument for "structural error" when he could show no prejudice). The Oregon Supreme Court has explained that the concept obscures the analysis of whether legal error was prejudicial or harmless. *Id.* at 296. Worse yet, notions of "structural error" are "not consistent with Article VII (Amended), section 3, of the Oregon Constitution," which requires that we "'must affirm a judgment, despite any error committed at trial, if, after considering all the matters submitted, the court is of the opinion that the judgment was

---

[8] Defendant cites the attorney-client privilege, OEC 503(2) (ORS 40.225(2)). The privilege, of course, is a rule of evidence, serving to prevent a party from invading privileged communications or from introducing evidence of privileged communications at trial. As an evidentiary privilege it does not determine the constitutional inquiry and it does little to suggest a remedy.

such as should have been rendered in the case.'" *Id.* (quoting *State v. Davis*, 336 Or 19, 28, 77 P3d 1111 (2003)) (internal quotation marks omitted).

Typically, in order to require a remedy, a defendant must offer some evidence that the violation of a constitutional right has resulted in some harm or prejudice. In *State v. Lewis (A123966)*, 217 Or App 56, 58, 174 P3d 1043 (2007), the defendant contended that the trial court's failure to appoint counsel until 13 weeks after his first court appearance violated his right to counsel under Article I, section 11, and required dismissal. *Id.* at 58. We rejected defendant's constitutional claim and held, "[E]ven assuming *arguendo* that defendant was unconstitutionally deprived of his right to counsel * * *, the fact remains that he has identified no evidence that the state obtained in violation of that right. Nor has he identified any other way in which he was prejudiced by the state's failure to provide him with a lawyer during that period of time." *Id.* at 59-60. Similarly, when a defendant argues that he was denied the right to a speedy trial under Article I, section 10, we have required the defendant to show some degree of actual—not speculative—prejudice to establish a constitutional violation sufficient to justify dismissal of the criminal charge. *State v. Garcia-Plascencia*, 148 Or App 318, 324, 939 P2d 641, *rev den*, 326 Or 58 (1997) (citing *State v. Mende*, 304 Or 18, 23, 741 P2d 496 (1987)).

Tailoring an appropriate remedy depends on the right at issue and the wrong suffered. For example, in considering the appropriate remedy for an unreasonable search under Article I, section 9, the Supreme Court determined that suppressing the illegally obtained evidence was appropriate because the goal of remedies for violations of the Oregon Constitution is "'to preserve * * * rights to the same extent as if the government's officers had stayed within the law.'" *State v. Davis*, 313 Or 246, 253-54, 834 P2d 1008 (1992) (quoting *State v. Davis*, 295 Or 227, 234, 666 P2d 802 (1983)). When the state violates "rules of law designed to protect citizens against unauthorized or illegal searches," those rules "are to be given effect by * * * restoring the parties to their position as if the state's officers had remained within the limits of their authority." *Davis*, 295 Or at 237.

In such cases, the remedy is to suppress evidence resulting from the violation.

The right to counsel and an appropriate remedy are at issue in cases involving drivers suspected of driving under the influence of intoxicants. In *State v. Spencer*, 305 Or 59, 74-75, 750 P2d 147 (1988), the court held that, "under the right to counsel clause in Article I, section 11, an arrested driver has the right upon request to a reasonable opportunity to obtain legal advice before deciding whether to submit to a breath test." (Footnote omitted.)

The problem arises when the state intrudes on those confidential communications. In *State v. Riddle*, 149 Or App 141, 144, 941 P2d 1079, *rev den*, 326 Or 68 (1997), a defendant consulted with her attorney, prior to a breath test, on a telephone line that automatically recorded phone calls. We concluded that the breath test should be suppressed, observing, "Defendant is entitled to a reasonable opportunity to *consult privately* with her attorney, and the chilling effect of tape recording the communication occurs at the time of the conversation. The violation cannot be cured later simply because no one listened to the tape." *Id.* at 148 (emphasis in original).

In *Durbin*, the arresting officer remained in the room and within earshot while the defendant conferred with a lawyer. 335 Or at 185. The state argued that the defendant had failed to show that his communication was actually "chilled" or affected by the officer's presence. The Supreme Court rejoined that the court "will not speculate here as to the effect of the arresting officer's presence on defendant's communications with his lawyer * * *." *Id.* at 192. The court concluded that the officer's presence destroyed the confidentiality necessary to exercise his right to counsel, and, therefore, violated Article I, section 11.

These cases have common features. The state's intrusion is contemporaneous, indeed interactive, with the defendant's exercise of the constitutional right, and further proof of prejudice becomes a non-issue. The remedy is tailored to the violation: Evidence of refusal to take the breath test or evidence of the test result is suppressed. In such cases the remedy is not to dismiss the case. In *Penrod*, the officer had

remained within earshot of defendant's telephone call to her lawyer. 133 Or App at 460. We held that defendant's breath test should be suppressed, but we rejected the defendant's contention that she was entitled to dismissal. We noted that "the officer here did not attempt to intercept any conversations or otherwise engage in any misconduct." *Id.* As she talked, he filled out paperwork. He could hear defendant but not her lawyer. "[H]e did not obtain or use any evidence from defendant's portion of the conversation." *Id.* Under such facts, dismissal was "not warranted."

Dismissal is strong medicine. Referring to the trial court's general authority under ORS 135.755 to dismiss an indictment in furtherance of justice, we have observed, "[D]ismissal * * * is reserved for severe situations because the dismissal of a charging instrument frustrates the public interest in having the prosecution of crimes occur in order to promote the protection of the public and the rehabilitation of offenders." *State v. Hadsell*, 129 Or App 171, 174, 878 P2d 444, *rev den*, 320 Or 271 (1994). In fashioning a remedy for a constitutional violation, a court should be mindful that "[t]he power to bar prosecution, with all its attendant public consequences, is a drastic one to be exercised only in exceptional circumstances." *State v. Williams*, 17 Or App 43, 48, 520 P2d 462 (1974). If defendant seeks dismissal and if dismissal is so serious a remedy, then some demonstrable prejudice would seem necessary.

This need has been explored in federal law, and that law lends some guidance. In *Weatherford v. Bursey*, 429 US 545, 97 S Ct 837, 51 L Ed 2d 30 (1977), the United States Supreme Court held that a defendant is required to identify some prejudice that resulted from governmental intrusions into attorney-client communications in order to find that a violation occurred under the Sixth Amendment to the United States Constitution. A criminal defendant and an undercover agent had been arrested together. The defendant asked the undercover agent to accompany him in meetings with the defendant's attorney. To maintain his cover, the agent agreed. The agent did not pass along to his superiors or to the prosecution anything about the defendant's trial plans, strategy, or anything about the case against the defendant. Later, the agent testified at the defendant's trial,

but his testimony did not involve anything he learned in the attorney meetings. The defendant was convicted. Later yet, the defendant, now turned plaintiff, filed a civil rights action under 42 USC section 1983. The Supreme Court rejected any *"per se"* or prophylactic rule for such intrusions. The Court recognized:

> "One threat to the effective assistance of counsel posed by government interception of attorney-client communications lies in the inhibition of free exchanges between defendant and counsel because of the fear of being overheard."

*Weatherford*, 429 US at 554 n 4. That threat, however, did not exist in *Weatherford*. The Court noted that the agent's testimony concerned earlier events, not anything about the attorney meetings. None of the government's evidence resulted from the agent's presence in the attorney meetings. The Court concluded that the defendant had failed to show that any prejudice resulted from the intrusion into defendant's confidential communications, and that, without "at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation." *Id.* at 558. The Supreme Court concluded:

> "There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by [the agent], there was no violation of the Sixth Amendment * * *."

*Id.* Under federal law, defendant's argument for presumptive prejudice or conclusive prejudice is unavailing.[9]

Defendant urges us to take guidance instead from other jurisdictions such as Washington and Connecticut, but

---

[9] In cases following *Weatherford*, the analysis has concerned how a defendant may show that prejudice resulted from an intrusion into confidential attorney-client communications. The Ninth Circuit Court of Appeals requires that "[i]n order to show * * * a violation of the Sixth Amendment, a defendant must show, at a minimum, that the intrusion was purposeful, that there was communication of a defense strategy to the prosecution, *or* that the intrusion resulted in tainted evidence." *United States v. Fernandez*, 388 F3d 1199, 1240 (9th Cir 2004), *modified on recons*, 425 F3d 1248 (9th Cir 2005) (citing *United States v. Danielson*, 325 F3d 1054, 1067 (9ᵗʰ Cir 2003). Other circuits rely on similar factors. *See generally* Joshua T. Friedman, *The Sixth Amendment, Attorney-Client Relationship and Government Intrusions: Who Bears the Unbearable Burden of Proving Prejudice?*, 40 J Wash U J Urb & Contemp L 109, 132 n 156 (1991) (collecting cases).

defendant's references would not support either a rebuttable or conclusive presumption of prejudice in defendant's case. Well before *Weatherford,* our northern neighbor adopted a presumption of prejudice in *State v. Cory,* 62 Wash2d 371, 382 P2d 1019 (1963). The Washington Supreme Court held that prejudice may be presumed where a sheriff had *purposefully* eavesdropped on a criminal defendant's private consultations with his attorney. *Id.* at 372-78, 382 P2d at 1020-23. That court directed that the charges be dismissed in order to deter the "odious practice of eavesdropping on privileged communication between attorney and client." *Id.* at 378, 382 P2d at 1023. In *State v. Garza,* 99 Wash App 291, 994 P2d 868 (2000), after a prison escape attempt, jail officials searched the prisoners' cells, and confiscated and examined their legal materials. The Washington Court of Appeals quoted approvingly of the Tenth Circuit's analysis that "when the state becomes privy to confidential communications *because of its purposeful intrusion* into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed." *Id.* at 299, 994 P2d at 872 (quoting *Shillinger v. Haworth,* 70 F3d 1132, 1134 (10th Cir 1995) (emphasis added).[10] The Washington Supreme Court recently added that "the presumption of prejudice arising from such eavesdropping is rebuttable." *State v. Fuentes,* 179 Wash2d 808, 819, 318 P3d 257, 262 (2014) (remanding for discovery where eavesdropping occurred after trial but may have influenced post-trial motions). The prosecution's burden in rebutting that presumption is high; it must show beyond a reasonable doubt that defendant was not prejudiced. *Id.* at 820, 318 P3d at 262. In these cases, Washington has employed a presumption of prejudice based

---

[10] Reflecting the fact that prejudice is not generally presumed, the court in *Garza* noted that

"even if there is no presumption of prejudice, the defendants still may demonstrate prejudice by demonstrating (1) that evidence gained through the intrusion will be used against them at trial; (2) that the prosecution is using confidential information pertaining to defense strategies; (3) that the intrusions have destroyed their confidence in their attorneys; or (4) that the intrusions will otherwise give the State an unfair advantage at trial."

*Id.* at 301, 994 P2d at 873 (citing *United States v. Irwin,* 612 F2d 1182, 1187 (9th Cir 1980)).

largely on a deterrence rationale.[11] And, these cases reflect that Washington's presumption arises when police or prosecutors have made *purposeful* intrusions into attorney-client communications.

Defendant's reference to Connecticut is likewise distinguishable insofar as the decision in that state was based on an even more egregious state of facts. In *State v. Lenarz,* 301 Conn 417, 22 A3d 536 (2011), the prosecutor had read numerous documents which were protected by the attorney-client privilege and which detailed defendant's trial strategy. In a lengthy opinion surveying federal law, the court determined that a presumption of prejudice should arise when the prosecutor learns of confidential communications containing trial strategy. That is, "the burden is not on the defendant to establish that he was prejudiced when the prosecutor has intruded on attorney-client communications that contain information concerning the defendant's trial strategy." *Id.* at 436, 22 A3d at 549 (footnote omitted). The court reasoned that "because the disclosure of such information is *inherently prejudicial,* prejudice should be presumed[.]" *Id.* at 437, 22 A3d at 549 (emphasis in original). The state may rebut that presumption by clear and convincing evidence. *Id.* at 425, 22 A3d at 542. The court emphasized that the presumption of prejudice arises upon the disclosure of trial strategy *to the prosecutor. Id.* ("[P]rejudice may be presumed when the prosecutor has * * * read[] privileged materials containing trial strategy."); *id.* at 451, 22 A3d at 558 ("This is a case in which the prosecutor clearly invaded privileged communications that contained a detailed, explicit road map of the defendant's trial strategy."). Because the case was "irrreversibly tainted by the prosecutor's intrusion into the privileged communications, the only available appropriate remedy," on the facts there, was dismissal of the charges of which defendant was convicted. *Id.* at 419, 22 A3d at 539.

Defendant urges that this case is like *Lenarz* because the jail, police, and prosecution should be treated

---

[11] At least in matters involving searches under Article, I, section 9, Oregon has eschewed a deterrence rationale and chosen a restorative rationale whereby a remedy, such as suppression of evidence, is based upon vindicating a person's constitutional rights by returning a person to the same position as if the authorities had stayed within the law. *Hall,* 339 Or at 24; *Davis,* 313 Or at 249.

as one entity. Defendant suggests that knowledge in the mind of one person should be imputed without distinction to all government actors. Thus, the detective's inadvertent review of a page of a letter should be deemed communicated to the prosecutor, despite the fact the prosecutor forbade exactly that communication. As authority, defendant relies on the collective knowledge doctrine, whereby, for example, an officer in a police unit may make a traffic stop based on a request from another officer who has information that suffices as probable cause to stop a car. *See, e.g., State v. Soldahl*, 331 Or 420, 427, 15 P3d 564 (2000); *State v. Pratt*, 309 Or 205, 785 P2d 350 (1990). While turnabout may seem fair play, that doctrine has no application here. In these circumstances, the prosecution and detective did not communicate so as to act together to make an arrest or traffic stop. To the contrary, the prosecutor and detective both acted to prevent communication. For defendant to show the potential for prejudice like the egregious facts in *Lenarz,* something more is necessary than fiction or an inapplicable doctrine.

We cannot conclude that a presumption of prejudice, whether rebuttable or conclusive, should arise on the facts of this case. There was evidence from which the trial court could conclude that the intrusions into his mail were not purposeful. Defendant did not contest the validity of the police request that defendant's mail be monitored for the potential that defendant may seek to influence a witness. The detective's reading of one letter was inadvertent, rather than an intentional intrusion into confidential communications. Defendant had failed to mark the letter's envelope as "legal mail," and he had not identified the letter's recipient as an attorney. The prosecutor was screened from the contents of that letter. The detective did not change his investigation based on the information in the letter. The investigation was complete months before. No evidence was produced at trial based on any information from the letter. None of defendant's trial strategy or evaluation of the case was disclosed to the prosecution or used to defendant's disadvantage at trial. As for the five or six envelopes which were duly if not boldly marked as legal mail, there was no evidence that the letters inside the envelopes had been read by the detective or the prosecutor. Defendant provided no evidence that the

opening and resealing of the envelopes was done with any purpose or effect of causing harm to his defense. Hickey testified that he never encountered or read those letters and Watts testified that no one outside of the jail would have had access to those letters. The trial court found both witnesses credible. We defer to a trial court's findings of credibility where they are based on an opportunity to see and hear witnesses. *State v. Hall*, 166 Or App 348, 361, 999 P2d 509 (2000). This is especially true where credibility based on demeanor is a crucial factor in making an appraisal of the evidence. *Id.* at 362-63 (citing *Wales v. Lester*, 267 Or 379, 382, 517 P2d 281 (1973)).

Defendant's final argument is that, if there is no presumption, then he was prejudiced because his right to counsel was "chilled" like that of the defendants in Oregon's breath test cases. Those cases, however, are inapposite. In those cases, the police intrusion typically is simultaneous with a defendant's exercise of the right to counsel, and it happens in a limited time when the defendant's *only* communication is a telephone call with an officer within earshot. The prejudice is evident. The remedy is confined to suppression of the evidence of the breath test. Other evidence of intoxication at the scene may remain. The charge is not dismissed, let alone with prejudice.

This case is unlike the breath test cases. Defendant had already fully expressed himself in the letter before the detective inadvertently saw it; nothing had inhibited defendant's communication to his attorney. Defendant and counsel exchanged five or six letters that were opened and resealed in an imperfect exercise of the jail's mail policy on contraband. Defense counsel did not discover the resealed envelopes until well after the communications. Defendant attested, after learning of the letter the detective had seen and after the return of the misaddressed and resealed letter to his attorney, that he relied on his attorney's opinion that future correspondence would not be opened. "Because I relied upon his opinion, I continued to write to him without concern for that [*sic*] our correspondence would remain confidential and subject to the attorney[-]client privilege." He did declare that he had become afraid to correspond with his attorney because the state had intruded into prior

communications. Whatever the explanation for the resealed envelopes, defendant and his counsel evidently did communicate in writing repeatedly. Whatever the nature of each intrusion, it was not contemporaneous with the written communication, like an officer sitting near a defendant making a call about a breath test. Unlike that single, compromised call to a lawyer, here defendant testified that he "visited in person" with his attorney, and he "visited * * * [o]n the phone" with his attorney—on a line that was unmonitored. The circumstances here did not compel the trial court to have concluded that defendant's ability to communicate with his attorney was impaired.

In sum, these facts do not justify a presumption of prejudice. Even if a presumption were posited, it would be rebutted on facts in which an inadvertent intrusion is immediately disclosed to the defense, steps are taken to isolate the prosecutor from any privileged information, no defense strategy or evaluation is revealed, and no evidence from any intrusion clouds the trial. Ultimately, the record supports the trial court's implicit conclusion that defendant was not prejudiced.

The trial court did act to respond to the potential for a violation of defendant's right to counsel. As recounted at the outset, the court forbade the detective from testifying about anything related to the content of the letter seen. The court invited defense counsel to be alert for any indication during trial of evidence related to any improper intrusion. The court was willing to stop the trial and conduct an *in camera* review of the privileged communications in order to insure the intrusions into defendant's mail did not produce testimony or evidence at the trial. Defendant never saw need for the court's added protection. Neither the state nor defendant have assigned error to the court's tailored response to the risk of prejudice to defendant. Under these circumstances, the trial court's chosen remedy was appropriate, and defendant's motion to dismiss was too much to ask. *See Lewis*, 217 Or App at 61 (refusing dismissal in the absence of tainted evidence or other prejudice); *see also Penrod*, 133 Or App at 460 (refusing dismissal). The trial court did not err in denying the motion.

Finally, defendant assigns error in his supplemental brief to the trial court's admission of testimony by an examiner at CARES Northwest regarding "delayed reporting." As to relevance, *State v. White*, 252 Or App 718, 725, 288 P3d 985 (2012), explains that testimony about "delayed reporting" counters a possible inference that the delay is indicative of fabrication. As for "vouching," there was none. The witness testified that delayed disclosure "doesn't mean abuse did happen or didn't happen." The testimony did not implicate *State v. Southard*, 347 Or 127, 218 P3d 104 (2009). No error occurred.

Affirmed.