166 April 24, 2024 No. 259

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHAWN QUENTIN GREENWOOD,
*Defendant-Appellant.*
Baker County Circuit Court
20CR02558; A177025

Matthew B. Shirtcliff, Judge.

Argued and submitted June 5, 2023.

Emily P. Seltzer, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Timothy A. Sylwester, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

MOONEY, J.

Reversed and remanded for entry of judgment of dismissal on Counts 7 and 8 and for further proceedings.

**MOONEY, J.**

Defendant appeals a judgment of conviction for criminally negligent homicide, ORS 163.145, fleeing or attempting to elude a police officer, ORS 811.540, and first-degree burglary, ORS 164.225, entered after conditional no-contest pleas. He assigns error to the trial court's denial of his pretrial motion to dismiss, arguing that "an irrebuttable and conclusive presumption of prejudice" arose when the state violated his state and federal constitutional right to counsel by "intrud[ing] upon [his] attorney-client privilege," when the lead detective listened to recordings of defendant's phone conversations with his attorney. Alternatively, defendant argues that the state bore the burden to show that the purposeful intrusion did not prejudice him and that the state failed to meet that burden. Defendant emphasizes that the calls "contained discussion of trial strategy," that the intrusion was intentional, and that the detective who committed the intrusion had been "involved in every aspect of a lengthy and wide-ranging criminal investigation, and *** worked closely with other officers and with the prosecutor." Defendant contends that because the lead detective's role was "central" and her conduct "egregious and intentional," the state's case was "irreparably tainted" and dismissal was required.

We conclude that the state violated defendant's constitutional right to counsel when the lead detective intentionally listened to several recorded phone conversations between defendant and his attorney, which included privileged communications between them about trial strategy. We conclude, further, that a rebuttable presumption of prejudice arose once defendant made a *prima facie* showing that the violation occurred, that it was intentional, and that it resulted in the disclosure of defense trial strategy. The burden then shifted to the state to show, by clear and convincing evidence, that defendant was not prejudiced by the violation. As we will explain, the state did not meet its burden to rebut the presumption of prejudice as to those charges that were added after the violation occurred (Counts 7 and 8). We, thus, conclude that the trial court erred when it declined to dismiss those two counts. But, as we will also explain,

the state did not have the opportunity to develop a factual record addressing the correct legal question with respect to the charges on which defendant had already been indicted before the violation occurred. Our disposition is intended to allow the state that opportunity should defendant opt to withdraw his plea.

We reverse and remand the judgment for the trial court to:

1.   Enter a judgment of dismissal on Counts 7 and 8;

2.   Allow defendant an opportunity to withdraw his plea pursuant to ORS 135.335(3); and

3.   If defendant does withdraw his plea, afford the state an opportunity to prove, by clear and convincing evidence, that defendant was not prejudiced by the state's violation of defendant's constitutional right to counsel with respect to Counts 1 through 6.

## I.   THE FACTS

A.   *The Shooting and the Arrest*

The pertinent facts are not disputed. On January 13, 2020, law enforcement officers responded to reports of a shooting at the Baker Land Management building. Officers discovered two victims—a man with a gunshot wound to his hand and a deceased woman. Defendant was arrested that same day, lodged at the Baker County Jail (the jail), and charged by district attorney's information with two counts of second-degree assault. The information was amended the next day to add a count of second-degree murder.

B.   *The Indictments*

Defendant was charged by indictment dated January 23, 2020, with two counts of second-degree assault, one count of second-degree murder, and one count of fleeing or attempting to elude a police officer. The indictment was amended on March 19, 2020, to add one count of solicitation to commit murder. In April 2020, the court extended the grand jury's term to allow the state more time "to examine other potential charges relating to this case." On September 9, 2020, the second amended indictment was filed adding a count of first-degree assault. The indictment was amended

again on October 21, 2020, to add one count of first-degree murder, and again, on February 10, 2021, to add one count of first-degree burglary. The lead detective who listened to the recorded jail calls testified before the grand jury before each indictment was issued.

C.  *The Jail's Telmate System*

The Baker County Sheriff's Office (the sheriff's office) operates a software system known as Telmate that enables it to monitor and record telephone calls placed by inmates. Lieutenant Duby of the Baker City Police Department had direct access to Telmate through a password-protected account that the sheriff's office assigned to him. Duby shared his access credentials with Detectives Regan and Sells, who were responsible for listening to jailhouse calls and preparing reports for Duby's review.

Jail staff have the ability to block designated phone numbers from Telmate's recording function. Attorney phone numbers are generally blocked to ensure that conversations between inmates and their attorneys are not monitored or recorded. For unknown reasons, the phone number for defendant's attorney had never been properly entered into the system as a blocked number. Defendant called his attorney several times using that unblocked number.

D.  *The Recorded Calls*

In November 2020, defendant asked his attorney to determine whether any calls that took place between the two of them while he was lodged at the jail had been recorded. Corporal D. Lefever confirmed that five such calls had, in fact, been recorded. Lefever made two copies of the recorded calls, and one CD was turned over to defense counsel and the other to Sheriff Ash. Ash testified that although he intended to deliver his copy to the prosecutor's office, he did not do so. He held that copy in his desk, where it remained for approximately eight months.

Based on conversations with Telmate, the sheriff's office initially reported that the recorded calls had not been listened to or otherwise accessed. But by June 2021, Corporal M. Lefever confirmed that several of the calls

between defendant and his attorney had been accessed through Duby's Telmate credentials on September 14, 2020. When the prosecutor was told that there were recorded calls between defendant and his attorney and that the calls had been accessed, he questioned Duby, Sells, and Regan, each of whom denied listening to the calls. The prosecutor made a report to the Department of Justice and the Oregon State Police, and an investigation was conducted. It was determined that Regan, the lead detective on defendant's case, had accessed the calls from her computer.

E.  *The Lead Detective's Role*

In her role as lead detective, Regan gathered crime scene evidence, drafted search warrants, and interviewed witnesses. She worked with, and reported to, Duby and the prosecutor. The criminal investigation was ongoing at the time Regan listened to the calls. Regan did not tell Duby or the prosecutor that she had listened to the recorded phone calls, and she did not report the content of those calls to either of them. Detective Sells explained that although they were permitted to listen to and monitor calls that defendant placed while he was in jail, they were not permitted to monitor calls between defendant and his attorney. Sells testified that he remembered Regan "mentioning she had heard an attorney phone call," but during that conversation, Regan stated that she "went to the next call." They did not discuss the call further and he assumed that the access had been inadvertent.[1]

## II. THE TRIAL COURT PROCEEDINGS

Defendant filed a motion to dismiss and to suppress evidence, asserting that his state and federal constitutional right to counsel had been violated. Relying on *State v. Russum*, 265 Or App 103, 333 P3d 1191, *rev den*, 356 Or 575 (2014), defendant argued that a presumption of prejudice arose from the violation of his right to counsel. He argued further that the presumption of prejudice should be deemed conclusive because the violation was intentional and because it was carried out by the lead detective on the case.

---

[1] The indictments and key events are listed in the following table, in chronological order, for ease of reference:

He argued that, even if the presumption was rebuttable, the state could not meet its burden. The state opposed the motion, arguing that dismissal was not appropriate because (1) the prosecutor had agreed not to call Regan as a witness, and (2) the court had insufficient information to determine whether the violations were purposeful or inadvertent.

At defendant's request, and pursuant to his limited waiver of the attorney-client privilege, the trial judge asked a different judge to conduct an *in camera* inspection of the recorded phone calls. After doing so, the reviewing judge prepared two memoranda for the trial judge, one outlining the content of the calls and one outlining the trial strategy discussed during the calls. After reviewing those memoranda, the trial court concluded that the level of intrusion

| Date | Event |
| --- | --- |
| January 23, 2020 | Indictment<br>✓ Count 1 – Assault II<br>✓ Count 2 – Assault II<br>✓ Count 3 – Murder II<br>✓ Count 4 – Fleeing Police Officer |
| March 19, 2020 | First Amended Indictment<br>✓ Adds Count 5 – Solicitation to Commit Murder |
| September 9, 2020 | Second Amended Indictment<br>✓ Adds Count 6 – Assault I |
| September 14, 2020 | Lead detective listens to recorded phone calls between defendant and his attorney |
| October 21, 2020 | Third Amended Indictment<br>✓ Adds Count 7 – Murder I |
| November 2020 | Sheriff's deputy confirms calls were recorded; advises defense counsel that calls had not been listened to Corporal burns two CDs of calls and provides one to defense counsel and one to Sheriff |
| February 10, 2021 | Fourth Amended Indictment<br>✓ Adds Count 8 – Burglary I |
| June 2021 | Sheriff confirms that phone calls were accessed through police lieutenant's Telmate account<br>Lead detective denies listening to calls<br>DA is advised of intrusion; reports to DOJ and OSP; investigation is conducted which determines that Regan accessed calls from her computer |

into defendant's right to counsel, based in part on the state's concession that the "breach falls into the purposeful category," was not inadvertent. It further found that the calls contained "discussions relating to trial strategy." The trial court required the state to prove, by clear and convincing evidence, that the content of the calls was not conveyed to the prosecution. The court found that the state met that burden:

> "The state has demonstrated by clear and convincing evidence that the prosecutor did not receive a copy or the contents of the communications of the privileged calls at question in this matter. Moreover, the court finds [Sheriff Ash] credible that he did not share the copies of the tapes or their contents with the District Attorney's Office. The court finds Detective Sells credible that he did not discuss the contents of the tapes with Detective Regan and did not learn through her the matters discussed including any trial strategy contained on the calls. This court finds that the contents of the calls were not listened to by anyone in law enforcement other than Detective Regan and that the contents of the calls were not conveyed to the District Attorney who is the prosecutor on the case.

> "While this case is factually distinguishable from the *Russum* case in that this case involves a purposeful intrusion, the court does not find that the factual scenario rises to grossly shocking or outrageous conduct warranting dismissal of the case. To be sure, the violation of [defendant's] right to counsel is clear and problematic; however, this is not a case where a prosecutor intentionally received defense trial strategy information that irreversibly taints the case. Moreover, the state has demonstrated by clear and convincing evidence that the contents of the calls including any trial strategy was not disclosed to the prosecutor and that no evidence resulted from the privileged information, and that no other compromise of defendant's constitutional rights occurred. Therefore, the court is denying the Defendant's Motion to Dismiss."

The court did, however, grant the motion to suppress, and it issued an order excluding (1) Regan's testimony; (2) all jail calls recorded on or after September 14, 2020, the date Regan accessed the calls; and (3) all evidence obtained by Regan after September 14, 2020. The court also instructed

the state to seek the court's advance direction at any point during trial that it might wish to offer any evidence collected by Regan before September 14, 2020, and to do so outside the presence of the jury.

Defendant entered conditional no-contest pleas to criminally negligent homicide (Count 3), fleeing or attempting to elude a police officer (Count 4), and first degree burglary (Count 8), and was convicted of those crimes. The remaining counts—second degree assault (Count 2), solicitation of murder (Count 5), first degree assault (Count 6), and first degree murder (Count 7) were dismissed pursuant to negotiations. This appeal followed.

III.   ARGUMENTS ON APPEAL

Defendant asks us to adopt a rule that would presume prejudice and require outright dismissal "when the state purposefully violates a defendant's right to counsel by accessing privileged communications." The state does not dispute that the violation occurred or that it was intentional but instead contends that a rule that presumes prejudice and requires dismissal would amount to a rule based on structural error, which would be inconsistent with Article VII (Amended), section 3, of the Oregon Constitution. The state adds that "defendant offers this court nothing more than his own idle speculation" that, despite the prosecutor's lack of direct knowledge of the calls, he may have indirectly received information obtained from the calls by Regan through their interactions on the case after the violation occurred. Defendant responds, however, that the burden to disprove prejudice should reside with the state in this case, and that the state's argument amounts to a reflexive and improper volley of the burden back to him. Defendant reasons that even if Regan never expressly conveyed the contents of the privileged calls to the prosecutor, her knowledge of defense strategy likely guided her work on the case and as that work unfolded, the content of the calls would have been conveyed to the prosecutor on a subliminal basis. Defendant acknowledges that, "[b]ecause the prosecutor never learned the content of the attorney-client calls, [the prosecutor] was not able to make a fact-dependent argument about the effect of that content on the prosecution team." But in defendant's

view, that simply means that if the presumption is rebuttable, the state did not meet its burden to disprove prejudice.

The state asks us to "pause" and take note of what defendant does not challenge on appeal. In the state's view, defendant does not challenge any of the trial court's findings of fact and he does not challenge the trial court's ruling to suppress certain evidence and to exclude Regan's testimony altogether. The state emphasizes that it does not dispute, nor does it seek to justify, Regan's conduct in "purposefully listen[ing] to the recordings" of the jail calls that included "privileged attorney-client communications." But according to the state, by the time Regan listened to the recorded jail calls in September 2020, defendant had already been charged on the basis of information that had necessarily been gathered before the constitutional violation occurred. It argues that the trial court crafted a clear and stringent suppression order that properly balanced the very serious violation of defendant's right to counsel with the state's interest in the prosecution of crimes and the protection of the public.

## IV.  STANDARD OF REVIEW

We review the trial court's ruling on a motion to dismiss for legal error. *Russum*, 265 Or App at 105. "We defer to the trial court's findings that are supported by evidence in the record, and, if there are no express findings of fact with respect to disputed factual issues, we presume that the facts were decided in a manner consistent with the trial court's decision." *Id.*

## V.  ANALYSIS

Defendant relies on both Article I, section 11, of the Oregon Constitution and the Sixth Amendment to the United States Constitution in support of his argument that Regan's intentional violation of his right to counsel conclusively prejudiced him. We have not before encountered the precise factual scenario presented by this case. The legal question, as framed by the parties, is one of first impression for us. We begin by reviewing each constitutional provision, "address[ing] defendant's state constitutional claim first." *State v. Krieger*, 306 Or App 71, 75, 473 P3d 550 (2020),

*rev den*, 367 Or 535 (2021) (citing *State v. Velykoretskykh*, 268 Or App 706, 707 n 2, 343 P3d 272 (2015) ("Under Oregon court's 'first things first' doctrine, we have an obligation to address state constitutional law claims before federal ones.")).

A.   *The Right to Counsel Under the Oregon Constitution*

Article I, section 11, embodies the state right to counsel for those accused of crimes and, as relevant, provides:

> "In all criminal prosecutions, the accused shall have the right \*\*\* to be heard by himself and counsel[.]"

Concerning that right, the Oregon Supreme Court has declared that:

> "The right to counsel is essential in our adversarial system of criminal law. Criminal prosecutions can carry great consequences, and criminal proceedings can be complex. The state utilizes trained professionals to represent its interests in prosecutions, and Article I, section 11, guarantees defendants the right to do the same."

*State v. Craigen*, 370 Or 696, 704, 524 P3d 85 (2023) (footnote omitted). The court further stated:

> "The right [to counsel] exists so that, when the state exercises its prosecutorial powers against a person, the person can call on counsel to assert and protect the person's rights. As such, it is a particularly important right, one through which other rights are given effect \*\*\*."

*Id.* at 705.

The right to counsel is an individual right that, by its nature, also serves the greater public good:

> "Although the Article I, section 11, right to counsel is an individual right, it benefits the criminal legal system and the public in general. The state constitutional rights of individuals, including the right to counsel, help ensure that the state abides by the legal limits on its authority, that criminal proceedings are fair, and that verdicts are reliable. Thus, although they are individual rights, they help preserve the rule of law and the integrity of the legal system."

*Id.*

It is well established that "when an individual has a constitutional right to consult with counsel, that right includes the right to confer privately with counsel." *State v. Durbin*, 335 Or 183, 190, 63 P3d 576 (2003). Indeed, "Oregon case law is resolute that confidentiality is inherent in the right to consult with counsel; to hold otherwise would effectively render the right meaningless." *Russum*, 265 Or App at 111-12 (internal quotation marks omitted). "The right to confer privately with counsel serves purposes in common with the attorney-client privilege." *Id.* at 112. That statutory privilege permits the client to prevent the disclosure of "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client[.]" OEC 503(2). The attorney-client privilege is "understood" to encourage open, honest, and complete discussions between attorneys and their clients to "promote broader public interests in the observance of law and administration of justice." *Russum*, 265 Or App at 112 (internal quotation marks omitted). The attorney-client privilege thus animates the constitutional right to counsel by promoting open dialogue between the accused and his legal counsel through its promise of confidentiality.

The remedy for a violation of an individual's right to counsel under the Oregon constitution is, generally, "the exclusion of any prejudicial evidence obtained as a result of that violation." *State v. Prieto-Rubio*, 359 Or 16, 38, 376 P3d 255 (2016). "[N]o presumption of prejudice arises in the absence of evidence of a purposeful intrusion that conveys the content of attorney-client communications to the prosecution." *Russum*, 265 Or App at 111.

In *Russum*, we considered whether the defendant could "be prosecuted after a jail official and a detective ha[d] opened mail to or from his attorney." *Id.* at 105. The letter, opened by a detective, had not been properly marked as "legal mail" and it contained discussion of the defendant's trial strategy. *Id.* at 108. When the detective realized that the letter was a privileged communication between an attorney and his client, he promptly notified the prosecutor, who instructed the detective not to communicate the letter's contents to him, to seal it, and to send it to the defendant's

attorney, which the detective did. *Id.* at 106. The prosecutor contacted the defendant's attorney to explain the situation. *Id.* at 107. We concluded:

> "[N]o presumption of prejudice arises in the absence of evidence of a purposeful intrusion that conveys the content of attorney-client communications to the prosecution. If the intrusion is inadvertent, [the] defendant must offer some evidence to show prejudice to his constitutional rights, such as the disclosure of trial strategy to the prosecution or the production of tainted evidence."

*Id.* at 111. We deferred to another day the question that is now before us:

> "If a purposeful intrusion takes and conveys privileged information, it will remain for another case to determine whether prejudice should be conclusive or might be rebutted by an appropriate standard of proof if the state could show that defense strategy or evaluations were not actually communicated to the prosecution, that no evidence resulted from or in response to the privileged information, and that no other compromise of defendant's constitutional rights occurred."

*Id.*

B.   *The Right to Counsel Under the Federal Constitution*

The Sixth Amendment provides, in relevant part:

> "In all criminal prosecutions, the accused shall enjoy the right to *** have the Assistance of Counsel for his defence."

In describing the Sixth Amendment right to "have the [a]ssistance of [c]ounsel," the United States Supreme Court has said:

> "This right, fundamental to our system of justice, is meant to assure fairness in the adversary criminal process. Our cases have accordingly been responsive to proved claims that governmental conduct has rendered counsel's assistance to the defendant ineffective.
>
> "At the same time and without detracting from the fundamental importance of the right to counsel in criminal cases, we have implicitly recognized the necessity for preserving society's interest in the administration of criminal justice."

*United States v. Morrison*, 449 US 361, 364, 101 S Ct 665, 66 L Ed 2d 564 (1981) (internal quotation marks and citations omitted). The federal right to legal counsel thus not only "protects the whole range of the accused's interests implicated by a criminal prosecution[,]" *Briggs v. Goodwin*, 698 F2d 486, 494, *vac'd on other grounds*, 712 F2d 1444 (DC Cir 1983), *cert den*, 464 US 1040 (1984), it serves to balance those interests with the opposing interests of the state and society in general.

Much like Article I, section 11, "the essence of the Sixth Amendment right is * * * privacy of communication with counsel." *U.S. v. Rosner*, 485 F2d 1213, 1224 (2nd Cir 1973), *cert den*, 417 US 950 (1974). Given that legal advice is delivered and received through the medium of language and is, at base, dependent upon candid, two-way dialogue between attorney and client, the importance of maintaining that confidentiality is clear.

The Sixth Amendment right to counsel is violated either by (1) the complete denial of counsel, or (2) the denial of the effective assistance of counsel. *United States v. Cronic*, 466 US 648, 659, 104 S Ct 2039, 80 L Ed 2d 657 (1984). Unless a defendant is denied counsel entirely or at a critical stage of the proceeding, making the verdict unreliable, a defendant claiming a violation of his federal right to the effective assistance of counsel must show prejudice. *Mickens v. Taylor*, 535 US 162, 166, 122 S Ct 1237, 152 L Ed 2d 291 (2002). A defendant making an ineffective assistance of counsel claim under either Article I, section 11, or the Sixth Amendment must show (1) substandard performance by legal counsel and (2) prejudice. *Strasser v. State of Oregon*, 368 Or 238, 247-48, 489 P3d 1025 (2021). The state and federal standards for such ineffective assistance of counsel claims are, thus, "functionally equivalent." *Montez v. Czerniak*, 355 Or 1, 6-7, 322 P3d 487, *adh'd to as modified on recons*, 355 Or 598, 330 P3d 595 (2014).

The United States Supreme Court in *Weatherford v. Bursey*, 429 US 545, 547, 97 S Ct 837, 51 L Ed 2d 30 (1977), a private civil rights action filed under 42 USC section 1983, addressed the issue of whether an undercover law enforcement agent who sat in on meetings between the defendant

and his attorney had "deprived [the defendant in the underlying criminal case] of his right to the effective assistance of counsel guaranteed him by the Sixth and Fourteenth Amendments of the United States Constitution or deprived him of due process of law in violation of the Fourteenth Amendment." The agent attended those meetings to maintain his undercover status and to avoid revealing his true identity to the defendant. *Id.* at 549. He did not provide the prosecution with any information about trial strategy or the defendant's defense, a fact that the Court explicitly relied on to hold that no Sixth Amendment violation had occurred. *Id.* at 549-50, 558 ("[U]nless [the agent] communicated the substance of the [attorney-client] conversations and thereby created at least a realistic possibility of injury to [the defendant] or benefit to the State, there can be no Sixth Amendment violation.").

The Court concluded that the defendant was required to show prejudice, noting that, "[a]s long as the information possessed by [the agent] remained uncommunicated, he posed no substantial threat to [the defendant's] Sixth Amendment rights." *Id.* at 556. The Court, thus, declined to adopt a *per se* rule of prejudice, and explained that in the absence of (1) tainted evidence, (2) communication of defense strategy to the prosecution, or (3) evidence that the government agent acted purposefully, "there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment."[2] *Id.* at 557-58.

The Court later struck a balance between "the fundamental importance of the right to counsel in criminal cases" and "society's interest in the administration of

---

[2] Other courts refer to those three factors as the "*Weatherford* factors" or the "*Weatherford* test," used "to determine whether a violation of the sixth amendment's right to privileged communication has occurred." *See, e.g., U.S. v. Dyer*, 821 F2d 35, 38 (1st Cir 1987) ("In *Weatherford*, the Court looked for (i) tainted evidence; (ii) communication of defense strategy to the prosecution; and (iii) purposeful intrusion by the government."); *see also U.S. v. Levy*, 577 F2d 200, 210 (3rd Cir 1978) ("We think that the Court was suggesting by negative inference that a sixth amendment violation would be found where, as here, defense strategy was actually disclosed or where, as here, the government enforcement officials sought such confidential information."); *see also U.S. v. Danielson*, 325 F3d 1054, 1067-69 (9th Cir 2003) (discussing and applying the *Weatherford* factors).

criminal justice" explaining that "Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." *Morrison*, 449 US at 364. The Court concluded that "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate." *Id.* at 365.

As we move to a discussion of other federal cases in which violations of the right to counsel are alleged, we note the large variety of contexts in which those cases arise. Indeed, many do not apply here. We describe a narrow subset of cases that focus on whether the violation was intentional, whether trial strategy was communicated to the prosecutor, and whether there was prejudice.

The First Circuit adopted a rule requiring the government to prove the absence of prejudice upon the defendant's *prima facie* showing of prejudice. *U.S. v. Mastroianni*, 749 F2d 900, 907-08 (1st Cir 1984). That court noted that "[t]he burden on the government is high because to require anything less would be to condone intrusions into a defendant's protected attorney-client communications." *Id.* at 908. It concluded that there was no Sixth Amendment violation in that case because the "reports did not in any way tend even to suggest [the defendant's] defense strategy to the government." *Id.*

The Sixth, Eighth, and Ninth Circuits have held that, even where the government intrusion is intentional, the defendant must demonstrate prejudice to establish a Sixth Amendment violation warranting a remedy. *See U.S. v. Steele*, 727 F2d 580, 586 (6th Cir 1984), *cert den*, 467 US 1209 (1984) ("Even where there is an intentional intrusion by the government into the attorney-client relationship, prejudice to the defendant must be shown before any remedy is granted."); *U.S. v. Singer*, 785 F2d 228, 234-35 (8th Cir 1986) (explaining that a Sixth Amendment violation alone does not require dismissal, and affirming the district court's decision to permit government agents with knowledge of the file to testify because defendant had not identified any

testimony that indicated knowledge of privileged information or that caused him prejudice); *U.S. v. Danielson*, 325 F3d 1054, 1074 (9th Cir 2003) (remanding case to district court because after the defendant showed purposeful violation by the government, the court must determine whether the government met its burden to show that its trial strategy was obtained from a legitimate source rather than from the informant who had wrongfully recorded the privileged conversations).

The Tenth Circuit adopted a *per se* rule of prejudice in a case where it concluded:

> "[W]e believe this case presents a situation unlike *Weatherford* in that the intrusion here was not only intentional, but also lacked a legitimate law enforcement purpose."

*Shillinger v. Haworth*, 70 F3d 1132, 1139 (10th Cir 1995).[3] Reasoning that *Weatherford* "recognized that under some circumstances a defendant's Sixth Amendment rights may be violated by the state's intrusion into the attorney-client relationship[,]" and noting *Weatherford*'s emphasis on "both the absence of purposefulness in the prosecutor's intrusion and the legitimate law enforcement interests at stake," that court held:

> "[W]hen the state becomes privy to confidential communications because of its purposeful intrusion into the attorney-client relationship and lacks a legitimate justification for doing so, a prejudicial effect on the reliability of the trial process must be presumed. In adopting this rule, we conclude that no other standard can adequately deter this sort of misconduct."

---

[3] We note that the Tenth Circuit has pending before it a case that it will decide en banc, with a request to counsel for supplemental briefing on two questions:

"A. Did *Shillinger v. Haworth*, 70 F3d 1132 (10th Cir 1995) correctly hold that it is structural error for the government to purposefully intrude without legitimate justification into the attorney-client relationship and that prejudice must be presumed?

"B. When, if ever, does the government unjustifiably intrude into the attorney-client relationship by intentionally obtaining attorney-client communications that are not privileged?"

*United States v. Hohn*, 91 F4th 1060 (10th Cir 2024).

*Shillinger*, 70 F3d at 1138-39, 1142. The court nevertheless remanded to the trial court to determine whether a retrial could "sufficiently purge the Sixth Amendment taint occasioned by the prosecutor's intrusion." *Id.* at 1143.

The Third Circuit concluded that where a prosecutor with improper knowledge of defense strategy tried a case to conclusion, the violation irreversibly tainted the proceeding and dismissal was the only means to cure the violation. *U.S. v. Levy*, 577 F2d 200, 210 (3rd Cir 1978). It reasoned:

> "[T]he interests at stake in the attorney-client relationship are unlike the expectations of privacy that underlie the fourth amendment exclusionary rule. The fundamental justification for the sixth amendment right to counsel is the presumed inability of a defendant to make informed choices about the preparation and conduct of his defense. Free two-way communication between client and attorney is essential if the professional assistance guaranteed by the sixth amendment is to be meaningful. The purpose of the attorney-client privilege is inextricably linked to the very integrity and accuracy of the fact finding process itself. *** In order for the adversary system to function properly, *any advice received as a result of a defendant's disclosure to counsel must be insulated from the government.* *** We think that the *inquiry into prejudice must stop at the point where attorney-client confidences are actually disclosed to the government* enforcement agencies responsible for investigating and prosecuting the case. Any other rule would disturb the balance implicit in the adversary system and thus would jeopardize the very process by which guilt and innocence are determined in our society."

*Id.* at 209 (emphasis added). Dismissal was required because "the integrity of the attorney-client relationship would be ill-served by devices to isolate new government agents from information which is now in the public domain." *Id.* at 210.

C.  *Other States*

State right-to-counsel cases, like federal cases, range broadly in their factual contexts and they address a wide variety of legal questions, not all of which are relevant here.[4] We restrict our discussion to cases that address the

_____

[4] For example, the Georgia Court of Appeals suggested *in dicta* that a *per se* Sixth Amendment violation occurs when the government purposefully intrudes

questions of intentionality, prejudice, and remedy where the state becomes aware of confidential trial and defense strategy. As we will explain, states generally tend to favor a rebuttable presumption of prejudice of some sort, with a requirement that the remedy be tailored to address the prejudice caused by the violation. There is considerable variation, however, as to (1) whether state courts presume prejudice and, if so, under what circumstances, (2) whether they place an initial burden on the defendant to show prejudice or on the state to show the absence of prejudice, and (3) what quantum of proof is required to meet that burden. *See, e.g.*, *State v. Lenarz*, 301 Conn 417, 438, 22 A3d 536, 550 (2011) (holding that disclosure of trial strategy to a prosecutor is presumptively prejudicial, shifting the burden to the state to disprove prejudice through clear and convincing evidence).

Deliberate prosecutorial misconduct often triggers closer scrutiny and more stringent remedies. For example, in South Carolina, deliberate prosecutorial misconduct raises a conclusive presumption of prejudice, regardless of the content of the intercepted communication. *State v. Quattlebaum*, 338 SC 441, 448, 527 SE2d 105, 109 (2000). In that case, the South Carolina Supreme Court reversed several convictions on direct appeal where the prosecutor had deliberately eavesdropped on a privileged conversation between the defendant and his attorney. *Id.* at 448-49, 527 SE2d at 109. Addressing the question of whether a Sixth Amendment violation resulted from the intrusion, the court explained:

> "We conclude, consistent with existing federal precedent, that a defendant must show either deliberate prosecutorial misconduct *or* prejudice to make out a violation of the Sixth Amendment, but not both."

*Id.* at 448, 527 SE2d at 109 (emphasis in original). That court held that "[d]eliberate prosecutorial misconduct raises an irrebuttable presumption of prejudice." *Id.*

into the attorney-client relationship, becomes privy to an attorney-client communication, and the intrusion is not justified by any legitimate law enforcement interests. *Burns v. State*, 368 Ga App 642, 645, 889 SE2d 447, 451 (2023), *rev allowed* (2024). However, that court did not adopt such a rule because it concluded that the communication between the accused and his attorney that was at issue was not, in fact, confidential because "there is no reasonable expectation of privacy in a recorded telephone call made from a jail or prison." *Id.* at 646, 889 SE2d at 451-52 (internal quotation marks omitted).

Connecticut required dismissal where the court found, after burden-shifting, that the prosecutor "clearly invaded privileged communications that contained a detailed, explicit road map of the defendant's strategy" and failed to disclose the invasion. *Lenarz*, 301 Conn at 451, 22 A3d at 558. It thus adopted a rebuttable presumption of prejudice when defense trial strategy is disclosed to the prosecutor, because such disclosure is "*inherently prejudicial*," without regard to the "subjective intent of the government." *Id.* at 437, 22 A3d at 549-50 (emphasis in original). That court also adopted a clear and convincing burden of proof for rebuttal. *Id.* at 437-38, 22 A3d at 550.

It is clear that any prosecutorial access to privileged information, especially trial strategy, is relevant to the analysis of prejudice. Idaho accurately highlighted the fundamental difficulty presented by such cases:

> "While there are not clear answers as to if and how the prosecution's access and retention led to specific outcomes that were prejudicial to [the defendant] at trial, this uncertainty is precisely the problem when the privileged communications at issue consist of the defendant's plans and strategies."

*State v. Robins*, 164 Idaho 425, 435, 431 P3d 260, 270 (2018).

In Nebraska, "a presumption of prejudice arises when the State becomes privy to a defendant's confidential trial strategy." *State v. Bain*, 292 Neb 398, 418, 872 NW2d 777, 790-91 (2016). That "presumption is rebuttable—at least when the State did not deliberately intrude into the attorney-client relationship." *Id.* at 418, 872 NW2d at 791. That court explained that the presumption is rebuttable because

> "some disclosures of confidential information to the State might be insignificant. Or the State could prove that it did not use the confidential information in any way to the defendant's detriment. For example, the State could prove that it did not derive its evidence and trial strategy from the disclosure of a defendant's trial strategy by showing that it had legitimate, independent sources for them."

*Id.* The Nebraska court held that the state's burden of proof on rebuttal must be by clear and convincing evidence:

"In cases involving individual rights, whether criminal or civil, the principle consideration in determining the proper standard of proof is whether the standard minimally reflects the value society places on individual liberty, because the function of legal process is to minimize the risk of erroneous decisions. The individual should not be asked to share equally with society the risk of error when the possible injury to the individual is significantly greater than any possible harm to the state.

"Applying these principles, we conclude that a mere preponderance standard is inappropriate. Both the State and the public have a substantial interest in the fair administration of criminal justice and protecting a defendant's constitutional rights. More particularly, our society necessarily places a high value on ensuring that criminal trials are not tainted by disclosures that unfairly advantage the prosecution and threaten to subvert the adversary system of criminal justice. And requiring a defendant to share a roughly equal risk of error in determining whether the State used his confidential information to his detriment does not reflect those values.

"Conversely, the beyond a reasonable doubt standard is a criminal trial protection that should not apply because the State is not proving the elements of a charged offense. And we recognized that this strictest criminal standard does not apply to the admissibility of evidence or \*\*\* the prosecution's burden of proof at a suppression hearing when evidence is challenged on constitutional grounds."

*Id*. at 420-21, 872 NW2d at 792 (internal quotation marks and footnotes omitted; ellipsis in original).

Arizona has adopted a burden-shifting rule of prejudice in cases involving purposeful intrusions into the attorney-client relationship, and it holds the state to a burden of proof beyond a reasonable doubt. *State v. Warner*, 150 Ariz 123, 128, 722 P2d 291, 296 (1986). That court remanded the case with the following instructions:

"The trial court should make separate and detailed findings regarding the motive behind the seizure of defendant's papers, the use made of them, whether the interference with the attorney relationship was deliberate, whether the state benefitted in any way from the seizure, if the papers

were used how any taint was purged in defendant's trial and whether defendant was, in fact, prejudiced."

*Id.* at 129, 722 P2d at 297.

States generally do not favor dismissal as a remedy for right-to-counsel violations if a less extreme remedy can be tailored to neutralize prejudice and ensure fairness. *See, e.g.*, *State v. Robinson*, 209 A3d 25, 58 (Del 2019) ("The overwhelming weight of the case law * * * holds that dismissal of an indictment with prejudice * * * should not be imposed absent findings of irreparable prejudice."). Not long after *Weatherford*, the California Supreme Court decided such a case. It dismissed the indictments because the evidence showed actual prejudice—reluctance of defendants to cooperate with their attorneys—stemming from the wrongful disclosure of defense strategy to the prosecutor by the undercover agent who had heard the privileged conversation. *Barber v. Municipal Court*, 24 Cal 3d 742, 755, 760, 598 P2d 818, 825, 828 (Cal 1979). Subsequent California cases likewise focus on whether prejudice exists when discerning the appropriate remedy:

> "[W]e conclude the assumed violation of the right to counsel in this case is not an error that by itself constitutes a miscarriage of justice, without consideration of the error's impact on the outcome of the case."

*People v. Alexander*, 49 Cal 4th 846, 897, 235 P3d 873, 897 (Cal 2010), *cert den*, 563 US 945 (2011). The California Supreme Court explained in a different case that it follows the analytic approach of *Weatherford* to evaluate Sixth Amendment claims:

> "Accordingly, we look to *Weatherford* to evaluate defendant's Sixth Amendment claim. * * *
>
> "* * * * *
>
> "Applying the *Weatherford* factors to defendant's claim, he fails to establish a constitutional violation. The officers who provided security were expressly admonished not to reveal the content of any overheard conversations *to anyone*. Again, there is no evidence they disregarded the court's admonishment by disclosing confidential communications. Nor did the officers testify regarding any attorney-client

> conversation. Finally, defendant fails to identify any evidence allegedly developed as a result of the correctional officers' presence. It is defendant's obligation to make such a record."

*People v. Delgado*, 2 Cal 5th 544, 561-63, 389 P3d 805, 818-19 (Cal 2017) (emphasis in original; citations and footnote omitted). The court, thus, concluded that the defendant had not established a Sixth Amendment violation and that, even if he had, he "failed to demonstrate a reasonable probability that, absent any alleged violation, the trial's outcome would have been more favorable." *Id.* at 568, 389 P3d at 823. That is to say, he did not establish prejudice. The court also noted that the evidence against the defendant was compelling. *Id.*

The Court of Appeals of Texas, Texarkana, recognized the state's "unique responsibility as a fiduciary to fundamental principles of fairness" and found that its intrusion was purposeful, but it nevertheless required the defendant to show that she had been prejudiced by the intrusion. *Morrison v. State*, 575 SW3d 1, 17 (Tex App 2019); *see also Robins*, 164 Idaho at 435, 431 P3d at 270 (holding that defendant "satisfied a prima facie showing of prejudice" where the evidence showed that the prosecuting attorney had "prolonged access to privileged notes" that included defense strategy, which shifted the burden to the state to prove an "independent origin" for its evidence and argument).

The Supreme Court of Washington held that "eavesdropping is presumed to cause prejudice to the defendant unless the State can prove *beyond a reasonable doubt* that the eavesdropping did not result in any such prejudice." *State v. Fuentes*, 179 Wash 2d 808, 812, 318 P3d 257, 259 (2014) (emphasis in original). The court thus concluded that "eavesdropping" is presumptively prejudicial, and it required the state to show, by proof beyond a reasonable doubt, that defendant was not prejudiced. *Id.* at 819-20, 318 P3d at 262.

Even in states where the facts led to a presumption of prejudice—with the exception of South Carolina—the courts employed a burden-shifting approach to determine actual prejudice. The wide variation in outcomes, it seems to us, reflects the wide variation in the factual circumstances of each case. It is likewise clear to us that the

analytic approach of *Weatherford* effectively balances the significant and opposing interests at stake in each case, yielding functionally different outcomes for different cases that are nevertheless consistent with those constitutionally protected interests.

D.  *This Case*

The question here, as framed by the parties, is whether the court erred in denying defendant's motion to dismiss. We conclude that the trial court erred in not dismissing Counts 7 and 8 when it ruled on defendant's pretrial motions. We reverse and remand the judgment for the court to enter a judgment of dismissal on Counts 7 and 8. We also reverse and remand the judgment to allow defendant an opportunity to withdraw his plea. If defendant withdraws his plea, the trial court is to proceed as to the first six counts in a manner consistent with this opinion.

We begin by summarizing the key constitutional principles discussed in the cases we have already mentioned. By its nature, the right to counsel ensures—through counsel—that other constitutional rights are asserted and enforced. The individual's right to counsel ensures fairness in the adversary process for the individual and for society. Fair trials promote and preserve the integrity of the criminal justice system through reliable verdicts, and they advance the public's interest in community and personal safety. The fact-specific nature of right-to-counsel cases requires careful attention to the violator's purpose, the content of the information obtained, and whether the violation prejudiced the defendant.

Next, we acknowledge that the assigned trial judge here enlisted the assistance of a different judge to evaluate the recorded calls, and that he asked that judge to conduct his review under *Russum*. In doing so, the trial judge (1) screened himself from evidence, the admissibility of which was uncertain, and (2) identified the most recent Oregon authority relevant to the task. The procedure employed by the trial court was thoughtfully designed, and we assume the accuracy of the factual description of the recorded calls as reported by the reviewing judge. But we do not agree with

the trial court's framing of the state's burden. The state's burden was not simply to prove that the content of the calls had not been conveyed to the prosecutor. It was to prove the absence of prejudice to defendant—*i.e.*, that defendant's position was the same "as if the state's officers had remained within the limits of their authority." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983). When properly framed, the record does not support the trial court's finding that the state met its burden, and it erred in concluding otherwise.

It is important to our analysis that the constitutional violation was intentional, that it served no legitimate law enforcement purpose, and that it yielded privileged information about trial strategy. When Regan was asked whether she had listened to the recorded calls, she denied that she had done so. But Regan's digital trail revealed that she listened to the calls and that she did so for an amount of time sufficient to establish that she did so on purpose. Regan's false denial strongly supports inferences that (1) she knew that listening to the calls was wrong, and that (2) the state derived some advantage from the information that she obtained by listening to the calls. The trial court was correct in finding that the violation was "clear and problematic," but it erred in concluding that the violation was not grossly shocking or outrageous.

Regan violated defendant's right to counsel intentionally and, in so doing, she obtained privileged trial strategy information. Regan not only led the investigation for one and a half years, but she also continued to lead the investigation for nine months after she listened to the calls, even after she lied about listening to the calls. The indictment was amended twice after Regan listened to the calls—once to add a count of murder in the first degree and once to add a count of burglary in the first degree. It is significant that Regan testified before the grand jury in each instance in support of the additional charge. We conclude that a presumption of prejudice arose once defendant made a *prima facie* showing that the violation occurred, that it was intentional, and that the violation resulted in the disclosure of defense trial strategy. We also conclude that the presumption is rebuttable. Our conclusion is consistent not only with

Oregon caselaw, but also with the vast majority of cases from other state and federal courts in this country.[5] It also follows Oregon's approach to remedying constitutional violations "in order to vindicate the individual's personal rights" by presumptively suppressing any prejudicial evidence "unless the state shows that the evidence did not result from that violation." *Craigen*, 370 Or at 711-12. Finally, our conclusion is also consistent with the principle that the state's interest as the people's representative is not to "win a case, but that justice shall be done." *Berger v. United States*, 295 US 78, 88, 55 S Ct 629, 79 L Ed 1314 (1935).

Defendant made a *prima facie* showing of an intentional violation of his right to counsel that revealed defense trial strategy information to the state's lead detective. That showing shifted the burden to the state to prove the absence of prejudice to defendant. The fact that the lead detective concealed the violation from the prosecutor may well be relevant to what the prosecutor knew or did not know, but it is not dispositive on the question of prejudice.[6] There is a difference between asking (1) whether the content of the calls had been conveyed to the prosecutor or to the other officers, (2) whether new evidence was discovered because of the violation, and (3) whether the state's case against defendant was influenced by the violation. The answer to each of those questions requires a greater showing than the question before it.

Whether the prosecutor was told about the content of the calls is not the same question as whether the case he was preparing was influenced by the content of those calls. Developing or refining trial strategy is not the same as gathering or developing evidence. To rebut the presumption of prejudice the state must do more than offer testimony from the other law enforcement officers that they did not

---

[5] Our review of federal caselaw, set forth above, leaves us unconvinced that the federal constitution would provide any greater remedy for defendant in this case than is provided under the Oregon Constitution. We, thus, resolve this appeal under the Oregon Constitution and we decline to further address defendant's federal constitutional arguments.

[6] The burden-shifting approach that we adopt today does not require us to accept the collective knowledge doctrine on which defendant relies and we do not do so. That doctrine is no more applicable here than it was in *Russum*. 265 Or App at 119.

know about the recordings, that they did not listen to them, and that no one ever told them what was in the calls. But because the trial court framed the question for the state as whether the content of the calls had been conveyed to the prosecutor, rather than whether defendant was prejudiced by the constitutional violation, that was the focus of the testimony that the state brought forward at the suppression hearing. There was no evidence offered that the state's case against defendant remained the same in terms of evidence and strategy after the violation occurred. Framed correctly, the record might have developed differently.

We next turn to the measure of proof that is required on rebuttal. As already mentioned, state and federal courts vary in their approach to the proper standard of proof when rebutting prejudice. In determining the appropriate standard, we are guided, in part, by the constitutional principle in Oregon that requires us, as an appellate court, to affirm a verdict despite any error when there is little likelihood that the particular error affected the outcome. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Implicit in that constitutional principle is the recognition that, even where a defendant's rights have been affected by a trial court's error, the ends of justice do not require an appellate remedy if there is "little likelihood" that the error affected the outcome. In such a case, despite the existence of error, we would affirm. While the state's burden of proof following an intentional violation of the right to counsel bears no legal relationship to the standard we apply when determining whether to remedy a trial court's error, we think that the underlying interests of justice are analogous. That is, when there is an intentional violation of the right to counsel that discloses trial strategy, a remedy is appropriate unless the state can show that the violation has little likelihood of affecting the outcome. Thus, the state bears a suitably heavy burden to show that the defendant will not suffer prejudice in the wake of the state's own unlawful acts. Translating that concept into the language of a more familiar standard of proof, we think the one most appropriate is the "clear and convincing" standard. That standard "requires the state to produce evidence that is of extraordinary persuasiveness and that makes the facts at issue highly probable." *State v. A. D. S.*, 258 Or App 44,

47, 308 P3d 365 (2013) (internal quotation marks omitted). We, thus, adopt a clear and convincing evidence standard as the state's burden of proof on rebuttal to show the absence of prejudice.

Dismissal of criminal charges is reserved for extreme cases because it is a remedy that "frustrates the public interest in having the prosecution of crimes occur in order to promote the protection of the public and the rehabilitation of offenders." *State v. Hadsell*, 129 Or App 171, 174, 878 P2d 444, *rev den*, 320 Or 271 (1994). A case-by-case analysis is required whenever a defendant seeks dismissal. Trial courts must tailor appropriate remedies, taking into consideration all the circumstances of a given case and balancing the competing interests at stake.[7]

This is an extreme case. Regan's intentional conduct was grossly shocking and outrageous. Counts 7 and 8 should have been dismissed because they were added after Regan violated defendant's right to counsel and, importantly, after she testified in the grand jury proceedings that resulted in the indictments with the new charges. The state did not, and on that record could not, carry its burden to show the lack of prejudice at that point in time.

We recognize that Counts 1 through 6 are different because they were included in indictments that were filed before Regan violated defendant's constitutional right to counsel. The question is whether the prosecutor gained an advantage in developing and refining the state's case against defendant on those existing charges because of the information that Regan obtained when she listened to the recorded calls. Although the trial court found, and the record supports, that Regan did not expressly disclose defendant's

---

[7] For example, we concluded that a trial court did not err in denying dismissal of a delivery of controlled substance case on speedy trial grounds where the nineteen-month delay did not prejudice the defendant. *State v. Garcia-Plascencia*, 148 Or App 318, 324, 939 P2d 641, *rev den*, 326 Or 58 (1997). In another case, we held that the defendant was entitled to suppression of a breath test after a police officer denied her attorney's request to speak with defendant on an unrecorded line, noting that the chilling effect occurred at the time of conversation and as such, "[t]he violation cannot be cured later simply because no one listened to the tape." *State v. Riddle*, 149 Or App 141, 147-48, 941 P2d 1079, *rev den*, 326 Or 68 (1997).

trial strategy to the prosecutor, it is not possible to conclude, on this record, that the prosecutor's case development and strategic planning were not influenced by that information, especially given Regan's extensive and continued work on the case. The record is not sufficient to allow a finding of what information had been developed, or from what source it had been obtained, before the date on which Regan listened to the calls in September 2020. Should defendant withdraw his plea on remand, the state is to be afforded the opportunity to develop a factual record on the question of whether, on Counts 1 through 6, defendant was prejudiced by the constitutional violation. *See State v. Turay*, 371 Or 128, 169, 532 P3d 57 (2023) (remanding a case for further proceedings where "[n]either party had the opportunity below to address the standard that we have now identified as governing" nor "was alerted to the need to create a factual record * * * under that standard"). If the state does not meet its burden, dismissal would be required. If the state meets its burden, the trial court would, at that point, be in the best position to determine whether anything more than a broad exclusionary order would be necessary to avoid the taint of the violation and to ensure a fair trial.

Having concluded that the trial court erred, we reverse and remand the judgment for the trial court to enter a judgment of dismissal on Counts 7 and 8, to allow defendant an opportunity to withdraw his plea, and for the court to proceed in a manner consistent with this opinion.

Reversed and remanded for entry of judgment of dismissal on Counts 7 and 8 and for further proceedings.